1  Benjamin Heikali (SBN 307466)
2  Joshua Nassir (SBN 318344)
   **FARUQI & FARUQI, LLP**
3  10866 Wilshire Boulevard, Suite 1470
   Los Angeles, CA 90024
4  Telephone: (424) 256-2884
5  Facsimile: (424) 256-2885
   E-mail: bheikali@faruqilaw.com
6  E-mail: jnassir@faruqilaw.com

7
   *Attorneys for Plaintiff Alexandria Rudolph*
8

9                    **UNITED STATES DISTRICT COURT**
10                  **CENTRAL DISTRICT OF CALIFORNIA**

11

| | |
|---|---|
| 12  ALEXANDRIA RUDOLPH, individually<br>13  and on behalf of all others similarly<br>     situated,<br>14<br>15             Plaintiff,<br>16<br>17        v.<br>18<br>19  SAKS & COMPANY LLC d/b/a SAKS<br>20  OFF 5TH, a Delaware limited liability<br>21  company,<br>22             Defendant. | Case No.: 2:18-cv-05107<br><br>**CLASS ACTION COMPLAINT**<br><br>1.  **Breach of Implied Contract;**<br><br>2.  **Negligence;**<br><br>3.  **Violations of Cal. Civ. Code<br>    §§ 1798.81.5 & 1798.82;**<br><br>4.  **Negligence Per Se;**<br><br>5.  **Unjust Enrichment;**<br><br>6.  **Declaratory Judgment; and**<br><br>7.  **Violation of California<br>    Business and Professions<br>    Code §§ 17500, *et seq.***<br><br>**JURY TRIAL DEMANDED** |

23
24
25
26
27
28

Plaintiff Alexandria Rudolph ("Plaintiff"), by and through her counsel, brings this Class Action Complaint against Saks & Company LLC d/b/a Saks OFF 5TH ("Saks" or "Defendant") on behalf of herself and all others similarly situated, and alleges upon personal knowledge as to her own actions, and upon information and belief as to counsel's investigations and all other matters, as follows:

## NATURE OF THE ACTION

1.      Plaintiff brings this consumer class action against Saks for its failures to secure and safeguard its customers' credit and debit card numbers, which Saks collected at the time Plaintiff and other Class members[1] made purchases at Defendant's Saks OFF 5TH stores ("Customer Data"), and for failing to provide timely, accurate and adequate notice to Plaintiff and Class members that their Customer Data had been stolen, as well as precisely what types of information were stolen.

2.      On March 28, 2018, the notorious hacking group known as Fin7 announced the successful data breach of an unnamed major corporation, resulting in the unauthorized release of over five million stolen credit and debit cards.[2]

3.      Subsequently, on April 1, 2018, the cyber-threat research group Gemini Advisory, working with several large financial institutions, confirmed that the stolen Customer Data belonged to Hudson's Bay Company ("HBC") (hereinafter, the "Gemini Report").[3] HBC is Defendant's parent company, owning the Saks Fifth Avenue, Saks OFF 5TH, and Lord & Taylor stores ("HBC stores").

4.       On the same day and following the Gemini Report, HBC confirmed that its HBC stores in North America were subject to a data breach.[4]

---

[1] Classes defined *infra* in Paragraphs 94-99.

[2] Gemini Advisory, *Fin7 Syndicate Hacks Saks Fifth Avenue and Lord & Taylor Stores* (April 1, 2018), *available at* https://geminiadvisory.io/fin7-syndicate-hacks-saks-fifth-avenue-and-lord-taylor/ (last visited June 7, 2018).

[3] *Id.*

[4] *Available at* https://www.saksfifthavenue.com/include/aem/aem_static.jsp?page=security-information-notice&site_refer=EML (last visited June 7, 2018).

1

**CLASS ACTION COMPLAINT**

5.     Later reports confirmed that the breach affected the point-of-sales ("POS") systems "at potentially all Saks Fifth Avenue, Saks OFF 5TH and Lord & Taylor locations in North America", running active from approximately July 1, 2017 to March 31, 2018.[5]

6.     The private Customer Data obtained from the data breach was compromised due to Saks' acts and omissions and its failure to properly protect the Customer Data.

7.     The failure to adequately protect Customer Data was not isolated to the 2017-2018 breach. Rather, in March 2017, HBC inadvertently "exposed the personal information of tens of thousands of [Saks Fifth Avenue] customers through the company's websites" to the public.[6]

8.     In addition to Saks' failure to prevent the data breach, Saks failed to detect the breach for more than eleven months, only making a public statement regarding the breach after the Gemini Report.[7]

9.     Saks disregarded Plaintiff's and Class members' rights by intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable data-security measures to ensure its data systems were protected, failing to take available steps to prevent and stop the breach from ever happening, failing to monitor and detect the breach on a timely basis, and failing to disclose to its customers the material facts that it did not have adequate computer systems and security practices to safeguard

---

[5] Hudson Bay Company, Notice of Data Breach (Apr. 27, 2018), *available at* *https://www.oag.ca.gov/system/files/HBC%20-%20Copy%20of%20Notice%20Materials_0.pdf* (last visited June 7, 2018).

[6] Scott Eells, *Hudson's Bay exposes Saks customer info online* (March 20, 2017), *available at* https://www.theglobeandmail.com/report-on-business/hudsons-bay-exposes-saks-customer-info-online/article34346027/ (last visited June 7, 2018).

[7] Jim Finkle and David Henry, *Saks, Lord & Taylor hit by payment card data breach* (April 3, 2018), *available at* https://www.reuters.com/article/legal-us-hudson-s-bay-databreach/saks-lord-taylor-hit-by-payment-card-data-breach-idUSKCN1H91W7 (last visited June 7, 2018).

**CLASS ACTION COMPLAINT**

1  Customer Data.

2      10.    If Saks had maintained and implemented proper data-security measures to

3  safeguard Customer Data, deter Fin7 and other hackers, and detect the breach within a

4  reasonable amount of time, it is more likely than not that the breach would have been

5  prevented, or at the very least, its harm mitigated.

6      11.    The data breach was the inevitable result of Saks' inadequate approach to

7  data security and the protection of the Customer Data that it collected during the course

8  of its business.  The deficiencies in Saks' data security were so significant that the

9  malware installed by the hackers remained undetected and intact for approximately one

10  year.

11      12.    The susceptibility of POS systems to malware is well-known throughout

12  the retail industry.  In the last five years, practically every major data breach involving

13  retail store chains has been the result of malware placed on POS systems.  Accordingly,

14  data security experts have warned companies, "[y]our POS system is being targeted by

15  hackers.  This is a fact of 21st-century business."[8]

16      13.    HBC, Defendant's parent company, also recognized the risk of a

17  consumer data breach in its Annual Information Form in April 2017, two months before

18  Fin7 successfully breached Saks' security systems. As HBC admits, "[a] potential

19  privacy breach could have a material adverse effect on our business and results of

20  operations."[9]  HBC further recognized that "[o]ur security measures may be

21  undermined due to the actions of outside parties, employee error, malfeasance, and, as

22  a result, an unauthorized party may obtain access to our data systems and

23  misappropriate business and personal information."[10]

24  

25  [8] Datacap Systems Inc., *Point of sale security: Retail data breaches at a glance*,
   *available at* https://www.datacapsystems.com/blog/point-of-sale-security-retail-data-

26  breaches-at-a-glance# (last visited June 7, 2018).

27  [9] Hudson Bay Company, Annual Information Form, at 61 (Apr. 28, 2017).

28  [10] *Id.*

**CLASS ACTION COMPLAINT**

14.    Indeed, Saks failed to take steps to employ adequate security measures despite recent, well-publicized data breaches at large national retail chains, including Brooks Brothers, Kmart, Target, and Home Depot. Furthermore, Saks exacerbated the situation by failing to detect the data breach earlier. Unfortunately, Saks' profit-driven decisions to ignore these warning led to the damage upon which this case is based. Had Saks detected the breach earlier, less data would have been stolen and customers would have been able to take earlier action to mitigate their damages.

15.    As a result of the data breach, Class members' Customer Data has been exposed to criminals for misuse. The injuries suffered by Plaintiffs and Class members as a direct result of Defendant's data breach include:

a.    unauthorized charges on their debit and credit card accounts;

b.    theft of their personal and financial information;

c.    costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

d.    damages arising from the inability to use their debit or credit card accounts because their accounts were suspended or otherwise rendered unusable as a result of fraudulent charges stemming from the Saks data breach including but not limited to foregoing cash back rewards;

e.    loss of use of and access to their account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including decreased credit scores and adverse credit notations;

f.    costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate and deal with the actual and future consequences of the data breach, including finding

**CLASS ACTION COMPLAINT**

fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with all issues resulting from the Saks data breach;

g.      the imminent and certainly impending injury flowing from potential fraud and identify theft posed by their credit card and personal information being placed in the hands of criminals and already misused via the sale of Plaintiff's and Class members' information on the Internet black market;

h.      damages to and diminution in value of their Customer Data entrusted to Defendant for the sole purpose of purchasing products and services from Saks and with the mutual understanding that Saks would safeguard Plaintiff's and Class members' data against theft and not allow access to and misuse of their information by others;

i.      money paid for products and services purchased at Saks stores during the period of Defendant's data breach, in that Plaintiff and Class members would not have shopped at Saks' stores had Saks disclosed that it lacked adequate systems and procedures to reasonably safeguard customers' Customer Data; and

j.      continued risk to their Customer Data which remains in the possession of Saks and which is subject to further breaches so long as Saks fails to undertake appropriate and adequate measures to protect Plaintiff's and Class members' data in its possession.

16.    The injuries to the Plaintiff and members of the Classes were directly and proximately caused by Saks' failure to implement or maintain adequate data security measures for Customer Data.

**CLASS ACTION COMPLAINT**

17.    Plaintiff and members of the Classes retain a significant interest in ensuring that their Customer Data, which remains in Saks' possession, is protected from further breaches, and seek to remedy the harms they have suffered on behalf of themselves and similarly situated consumers whose Customer Data was stolen as a result of the Saks data breach.

18.    Plaintiff, on behalf of herself and similarly situated consumers, seeks to recover damages, equitable relief including injunctive relief to prevent a reoccurrence of the data breach and resulting injury, restitution, disgorgement, reasonable costs and attorneys' fees, and all other remedies this Court deems proper.

## **JURISDICTION AND VENUE**

19.    This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million exclusive of interest and costs. At least one Plaintiff and Defendant are citizens of different states. There are more than 100 putative class members.

20.    This Court has personal jurisdiction over Saks because Saks conducts substantial business in California, including this District, and has sufficient minimum contacts in California. Additionally, the acts and omissions alleged herein were committed by Saks in this District, as Plaintiff used her Visa debit card at a Saks OFF 5TH store located in Los Angeles, California. Further, Saks manages and operates multiple retail stores located throughout California, including this District. Specifically, Saks operates and manages nineteen Saks OFF 5th and four Saks Fifth Avenue stores in California. Further, the majority of Saks' Saks Fifth Avenue and Saks OFF 5TH stores are located in California. Saks also maintains and operates a distribution center in this District, located in Sante Fe Springs, California. Accordingly, Saks intentionally avails itself of this jurisdiction by marketing, distributing, and selling products throughout California, including this District.

**CLASS ACTION COMPLAINT**

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district. Specifically, Plaintiff swiped her Visa debit card, which was subsequently frozen due to the suspected fraudulent activity, in Defendant's Saks OFF 5TH Beverly Hills, California location. The risk of future harm to Plaintiff's Customer Data also stems from Plaintiff's transactions in Defendant's Beverly Hills Saks OFF 5TH location.

### PARTIES

22.     Plaintiff Alexandria Rudolph is a resident of Los Angeles, California and was a California resident during the period of the Saks data breach. On November 23, 2017, Plaintiff purchased items at Defendant's Saks OFF 5TH retail store located at 100 N La Cienega Blvd., Beverly Hills, California, with her Visa debit card, which was swiped through a Saks point-of-sale payment device.

23.     On May 18, 2018, Bank of America notified Plaintiff of suspected fraudulent activity on the Visa debit card Plaintiff used during her November 2017 purchase at Defendant's Saks OFF 5TH retail location. As a result, Bank of America froze Plaintiff's account associated with the payment card. Following the hold placed on her account, Plaintiff expended time contacting Bank of America telephonically to attempt resolving the issue. Subsequently, Plaintiff was required to visit a Bank of America branch in person to resolve the issue.

24.     Plaintiff would not have used her debit card to make purchases at Saks — indeed, she would not have shopped at Saks at all during the period of the HBC data breach—had Saks told her that it lacked adequate computer systems and data security practices to safeguard customers' Customer Data from theft.

25.     Plaintiff suffered actual injury from having her Customer Data compromised and stolen in and as a result of the Saks data breach.

26.     Plaintiff suffered actual injury and damages in paying money to and purchasing products from Saks during the Saks data breach that she would not have

**CLASS ACTION COMPLAINT**

paid had Saks disclosed that it lacked computer systems and data security practices adequate to safeguard customers' Customer Data.

27.    Plaintiff suffered actual injury in the form of damages to and diminution in the value of her Customer Data – a form of intangible property that she entrusted to Saks for the purpose of purchasing its products and that was compromised in and as a result of the HBC data breach.

28.    Plaintiff suffered imminent and impending injury arising from the substantially increased risk of future fraud, identity theft and misuse posed by her Customer Data being placed in the hands of criminals who have already misused such information stolen in the Saks data breach via sale of Plaintiff's and Class members' Customer Data on the Internet black market. Plaintiff has a continuing interest in ensuring that her private information, which remains in the possession of Saks, is protected and safeguarded from future breaches.

29.    Plaintiff is likely to purchase items from Saks with a credit or debit card in the future if Saks' data security was improved to protect against future data breaches.

30.    Defendant Saks & Company LLC is a Delaware limited liability company with its headquarters located in New York, New York. Defendant maintains its support operations in Jackson, Mississippi, including functions such as accounting, credit card administration, and information technology. For example, Defendant maintains its primary support operation center in Jackson, Mississippi, which processes and tracks every point-of-sale transaction for Saks OFF 5TH locations.[11] Defendant also maintains and operates a distribution center in this District, located in Sante Fe Springs, California.

31.    HBC's retail system consists of over 110 corporate-owned Saks OFF 5TH locations across the U.S. and worldwide. Saks' retail stores accept payment for their

---

[11] Wally Northway, *Saks Operations Center Committed* To Jackson (July 2, 2007), *available at* http://msbusiness.com/2007/07/saks-operations-center-committed-to-jackson/.

**CLASS ACTION COMPLAINT**

goods and services through a POS system, through which customers use credit and debit cards to pay.

## STATEMENT OF FACTS

### A. History and Customer Data Collection Practices

32. HBC was founded in 1670 and is Canada's largest diversified general merchandise retailer, operating more than 480 stores worldwide. In 2017, HBC produced global sales of more than $14 billion.[12]

33. HBC serves as the parent company for the Saks Fifth Avenue, Saks OFF 5TH, and Lord & Taylor stores ("HBC stores"), acquiring the Saks Fifth Avenue brand in 2013.[13]

34. With its "soaring profits and revenues", HBC heavily invested in the remodeling of its stores and upgrades to its distribution and fulfillment centers, with "[o]ne of the company's biggest growth initiatives this year involve[ing] expanding the Saks Off 5th [. . .] footprint."[14] In fact, "[r]oughly 30% of the capital budget allocated to growth initiatives will be spent on 32 new Off 5th stores and seven new full line Saks stores" and the "number of Saks Off 5th stores will surge dramatically as will investment in technology. . . ."[15] Despite these substantial investments to upgrade the appearance and technology of its stores, in particular Saks' OFF 5th line of stores, to

---

[12] *Available at* https://www.marketwatch.com/investing/stock/hbc/financials.

[13] Michelle da Silva, *Hudson's Bay Company Acquires Saks Fifth Avenue* (Nov. 4, 2013), *available at* https://www.straight.com/news/522951/hudsons-bay-company-acquires-saks-fifth-avenue.

[14] Mike Troy, *Surging Hudson's Bay Details Major Investments in Expanding Saks, Saks Off 5th and Store Renovation* (April 5, 2016), *available at* https://www.chainstoreage.com/article/surging-hudsons-bay-details-major-investments-expanding-saks-saks-th-and-store-renovations/ (last visited June 7, 2018).

[15] *Id.*

**CLASS ACTION COMPLAINT**

boost sales, Saks failed to make meaningful improvements to its data security systems, including its POS systems, placing customer's Customer Data at risk.[16]

35.    A significant portion of these sales at Saks locations are made to customers using credit or debit cards. When Saks customers pay using credit or debit cards, Saks collects Customer Data related to those cards including the cardholder name, the account number, expiration date, and card verification value (CVV). Saks stores the Customer Data in its POS system and transmits this information to a third party for completion of the payment.

36.    At all relevant times, Saks was well-aware, or reasonably should have been aware, that the Customer Data it maintains is highly sensitive and could be used for wrongful purposes by third parties, such as identity theft and fraud.

37.    Stolen Customer Data is a valuable commodity. A "cyber black-market", such as the one used by Fin7, exists in which criminals openly post stolen payment card numbers, social security numbers, and other personal information on a number of underground Internet websites. The Customer Data is "as good as gold" to identity thieves because they can use victims' personal data to open new financial accounts and take out loans in another person's name, incur charges on existing accounts, or clone ATM, debit, or credit cards.

38.    Legitimate organizations and the criminal underground alike recognize the value in Customer Data contained in a merchant's data systems; otherwise, they would not aggressively seek or pay for it.

39.    At all relevant times, Saks knew, or reasonably should have known, of the importance of safeguarding Customer Data and of the foreseeable consequences that

---

[16] On information and belief, Saks contracted with various third parties to install, manage, service and maintain the POS equipment and software who may also be responsible or liable for allowing the hackers to gain access and deploy malware on the POS systems in Saks' network. Plaintiff hereby provides Notice that after discovery, she may seek leave to add those third party vendors as party defendants in this litigation.

**CLASS ACTION COMPLAINT**

would occur if its data security system was breached, including, specifically, the significant costs that would be imposed on its customers as a result of a breach.

40.     Saks was, or should have been, fully aware of the significant volume of daily credit and debit card transactions at its North American retail locations, amounting to a large volume of daily payment card transactions, and thus, the significant number of individuals who would be harmed by a breach of Saks' systems.

41.     Unfortunately, and as alleged below, despite all of this publicly available knowledge of the continued compromises of Customer Data in the hands of other third parties, such as other nationwide retailers, Saks' approach to maintaining the privacy and security of the Plaintiff's and Class members' Consumer Data was lackadaisical, cavalier, reckless, or at the very least, negligent.

**B.     Saks Had Notice of Data Breaches Involving Malware on POS Systems**

42.     A wave of data breaches causing the theft of retail payment card information has hit the United States in the last several years.[17] In 2016, the number of U.S. data breaches surpassed 1,000, a record high and a forty percent increase in the number of data breaches from the previous year.[18] The amount of payment card data compromised by data breaches is massive. For example, it is estimated that over 100 million cards were compromised in 2013 and 2014.[19]

---

[17] *Data Breaches Increase 40 Percent in 2016, Finds New Report From Identity Theft Resource Center and CyberScout*, Identity Theft Resource Center (Jan. 19, 2017), *available at* https://www.prnewswire.com/news-releases/data-breaches-increase-40-percent-in-2016-finds-new-report-from-identity-theft-resource-center-and-cyberscout-300393208.html (last visited June 7, 2018).

[18] *Id.*

[19] Symantec, *A Special Report On Attacks On Point-of-Sale Systems*, p. 3 (Nov. 20, 2014), *available at* https://origin-www.symantec.com/content/dam/symantec/docs/white-papers/attacks-on-point-of-sale-systems-en.pdf (last visited June 7, 2018).

11

**CLASS ACTION COMPLAINT**

43.     Most of the massive data breaches occurring within the last several years involved malware placed on POS systems used by merchants.  A POS system is an on-site device, much like an electronic cash register, which manages transactions from consumer purchases, both by cash and card. When a payment card is used at a POS terminal, "data contained in the card's magnetic stripe is read and then passed through a variety of systems and networks before reaching the retailer's payment processor."[20] The payment processor then passes on the payment information to the financial institution that issued the card and takes the other steps needed to complete the transaction.[21]

44.     Before transmitting customer data over the merchant's network, POS systems typically, and very briefly, store the data in plain text within the system's memory.[22] The stored information includes "Track 1" and "Track 2" data from the magnetic strip on the payment card, such as the cardholder's first and last name, the expiration date of the card, and the CVV (three number security code on the card).[23] This information is unencrypted on the card and, at least briefly, will be unencrypted in the POS terminal's temporary memory as it processes the data.[24]

45.     In order to directly access a POS device, hackers generally follow four steps: infiltration, propagation, exfiltration and aggregation.[25] In the infiltration phase,

---

[20] Symantec, *supra* note 13, at 6.

[21] Salva Gomzin, *Hacking Point of Sale: Payment Application Secrets, Threats, and Solutions*, 8 (Wiley 2014), *available at*   http://1.droppdf.com/files/IS0md/wiley-hacking-point-of-sale-payment-application-secrets-threats-and-solutions-2014.pdf (last visited June 7, 2018).

[22] *Id.* at 39.

[23] *Id.* at 43-50.

[24] Symantec, *supra* note 13, at 5.

[25] *Point of Sale Systems and Security: Executive Summary*, SANS Institute, 4 (Oct. 2014), *available at*   https://www.sans.org/reading-room/whitepapers/analyst/point-salesystems-security-executive-summary-35622 (last visited June 7, 2018).

**CLASS ACTION COMPLAINT**

an "attacker gains access to the target environment"[26] allowing the hackers to move through a business's computer network, find an entry point into the area that handles consumer payments, and directly access the physical POS machines at in-store locations.[27] Once inside the system the attacker then infects the POS systems with malware, which "collects the desired information . . . and then exfiltrates the data to another system" called the "aggregation point."[28]

46.    A 2016 report by Verizon confirmed "[t]he vast majority of successful breaches leverage legitimate credentials to gain access to the POS environment. Once attackers gain access to the POS devices, they install malware, usually a RAM scraper, to capture payment card data."[29] According to Verizon, hackers successfully compromise POS systems in a matter of minutes or hours and exfiltrate data within days of placing malware on the POS devices.[30]

47.    Intruders with access to unencrypted Track 1 and Track 2 payment card data can physically replicate the card or use it online. Unsurprisingly, theft of payment card information via POS systems is now "one of the biggest sources of stolen payment cards."[31] Since 2014, malware installed on POS systems has been responsible for nearly every major data breach of a retail outlet.[32] In 2015, intrusions into POS systems accounted for 64% of all breaches where intruders successfully stole data.[33] For example, in 2013, hackers infiltrated Target, Inc.'s POS system, stealing information

---

[26] *Id.*

[27] Symantec, *supra* note 13, at 6.

[28] *Id.*

[29] *Id.*

[30] *Id.* at 4.

[31] Symantec, *supra* note 13, at 3.

[32] *See, e.g., 2016 Data Breach Investigations Report*, Verizon, at 1 (Apr. 2016), http://www.verizonenterprise.com/resources/reports/rp_DBIR_2016_Report_en_xg.pdf, *available at* (last visited June 7, 2018).

[33] *Id.* at 3.

**CLASS ACTION COMPLAINT**

from an estimated 40 million payment cards in the United States.[34] In 2014, over 7,500 self-checkout POS terminals at Home Depots throughout the United States were hacked, compromising roughly 56 million debit and credit cards.[35]

48.   Given the numerous reports indicating the susceptibility of POS systems and consequences of a breach, Saks was aware or should have been aware of the need to safeguard its POS systems.

**C.   Saks Failed to Comply with Industry Standards**

49.   Despite the vulnerabilities of POS systems, available security measures and reasonable business practices would have significantly reduced or eliminated the likelihood that hackers could successfully infiltrate the business' POS systems. One report indicated that over 90% of the data breaches occurring in 2014 were preventable.[36]

50.   The payment card networks (MasterCard, Visa, Discover, and American Express), data security organizations, state governments, and federal agencies have all implemented various standards and guidance on security measures designed to prevent these types of intrusions into POS systems.  However, despite Saks' understanding of the risk of data theft via malware installed on POS systems, the widely available resources to prevent intrusion into POS data systems, and Saks' previous public display of customer's private information, Saks failed to adhere to these guidelines and failed to take reasonable and sufficient protective measures to prevent the Data Breach.

51.   Security experts have recommended specific steps that retailers should take to protect their POS systems. For example, more than two years ago, Symantec recommended "point to point encryption" implemented through secure card readers,

---

[34] Krebs, *supra* note 1.

[35] Brett Hawkins, *Case Study: The Home Depot Data Breach,* 7 (SANS Institute, Jan. 2015), *available at* https://www.sans.org/reading-room/whitepapers/casestudies/casestudy-home-depot-data-breach-36367 (last visited June 7, 2018).

[36] Verizon, *supra* note 26, at 1.

**CLASS ACTION COMPLAINT**

which encrypts credit card information in the POS system, preventing malware that extracts card information through the POS memory while it processes the transaction.[37] Moreover, Symantec emphasized the importance of adopting EMV chip technology. Last year, Datacap Systems, a developer of POS systems, recommended similar preventative measures.[38]

52.    The major payment card industry brands set forth specific security measures in their Card (or sometimes, Merchant) Operating Regulations. Card Operating Regulations are binding on merchants and require merchants to: (1) protect cardholder data and prevent its unauthorized disclosure; (2) store data, even in encrypted form, no longer than necessary to process the transaction; and (3) comply with all industry standards.

53.    The Payment Card Industry Data Security Standard ("PCI DSS") is a set of requirements designed to ensure that companies maintain consumer credit and debit card information in a secure environment.[39]

54.    The PCI DSS "was developed to encourage and enhance cardholder data security" by providing "a baseline of technical and operational requirements designed to protect account data."[40] PCI DSS sets the minimum level of what must be done, not the maximum.

55.    PCI DSS 3.2, the version of the standards in effect at the time of the Data Breach, imposes the following mandates on Saks:[41]

---

[37] Symantec, *supra* note 13, at 6.

[38] *See* Datacap Systems, *supra* note 2.

[39] *Payment Card Industry Data Security Standard* v3.2, at 5 (Apr. 2016), *available at* https://www.pcisecuritystandards.org/document_library?category=pcidss&document=pci_dss (last visited June 7, 2018).

[40] *Id.*

[41] *Id.*

**CLASS ACTION COMPLAINT**

| PCI Data Security Standard – High Level Overview | | |
|---|---|---|
| Build and Maintain a Secure Network and Systems | 1. | Install and maintain a firewall configuration to protect cardholder data |
| | 2. | Do not use vendor-supplied defaults for system passwords and other security parameters |
| Protect Cardholder Data | 3. | Protect stored cardholder data |
| | 4. | Encrypt transmission of cardholder data across open, public networks |
| Maintain a Vulnerability Management Program | 5. | Protect all systems against malware and regularly update anti-virus software or programs |
| | 6. | Develop and maintain secure systems and applications |
| Implement Strong Access Control Measures | 7. | Restrict access to cardholder data by business need to know |
| | 8. | Identify and authenticate access to system components |
| | 9. | Restrict physical access to cardholder data |
| Regularly Monitor and Test Networks | 10. | Track and monitor all access to network resources and cardholder data |
| | 11. | Regularly test security systems and processes |
| Maintain an Information Security Policy | 12. | Maintain a policy that addresses information security for all personnel |

56.    Among other things, PCI DSS required Saks to properly secure and protect payment card data; not store cardholder data beyond the time necessary to authorize a transaction; maintain up-to-date antivirus software and a proper firewall; protect systems against malware; regularly test security systems; establish a process to identify and timely fix security vulnerabilities; and encrypt payment card data at the point of sale.

57.    PCI DSS also required Saks to not store "the full contents of . . . the magnetic stripe located on the back of a card" or "the card verification code or value" after authorization.[42]

58.    Despite Saks' awareness of its data security obligations, Saks' treatment of Customer Data entrusted to it by its customers fell far short of satisfying Saks' legal duties and obligations, and included violations of the PCI DSS.  Saks failed to ensure that access to its data systems was reasonably safeguarded, failed to acknowledge and act upon industry warnings and failed to use proper security systems to detect and deter the type of attack that occurred and is at issue here.

---

[42] *Id.* at 38 (PCI DSS 3.2.1 and 3.2.2).

**CLASS ACTION COMPLAINT**

1    **D.    Saks Failed to Comply With FTC Requirements**

2        59.    Federal and State governments have likewise established security

3    standards and issued recommendations to temper data breaches and the resulting harm

4    to consumers and financial institutions. The Federal Trade Commission ("FTC") has

5    issued numerous guides for business highlighting the importance of reasonable data

6    security practices. According to the FTC, the need for data security should be factored

7    into all business decision-making.[43]

8        60.    In 2016, the FTC updated its publication, *Protecting Personal*

9    *Information: A Guide for Business*, which established guidelines for fundamental data

10   security principles and practices for business.[44]  The guidelines note businesses should

11   protect the personal customer information that they keep; properly dispose of personal

12   information that is no longer needed; encrypt information stored on computer

13   networks; understand their network's vulnerabilities; and implement policies to correct

14   security problems.  The guidelines also recommend that businesses use an intrusion

15   detection system to expose a breach as soon as it occurs; monitor all incoming traffic

16   for activity indicating someone is attempting to hack the system; watch for large

17   amounts of data being transmitted from the system; and have a response plan ready in

18   the event of a breach.

19       61.    The FTC recommends that companies not maintain cardholder

20   information longer than is needed for authorization of a transaction; limit access to

21   sensitive data; require complex passwords to be used on networks; use industry-tested

22

23

24   [43]    Federal    Trade    Commission, *Start    With    Security*, *available    at*

25   https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwith

26   security.pdf (last visited June 7, 2018).

27   [44] Federal Trade Commission, *Protecting Personal Information: A Guide for Business*,

28   *available    at*    https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_
     proteting-personal-information.pdf (last visited June 7, 2018).

17

**CLASS ACTION COMPLAINT**

methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[45]

62.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

63.     Saks' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

64.     In this case, Saks was at all times fully aware of its obligation to protect the financial data of its customers because of its participation in payment card processing networks. Saks was also aware of the significant repercussions if it failed to do so because Saks collects payment card data from tens of thousands of customers and they knew that this data, if hacked, would result in injury to consumers, including Plaintiff and Class members.

65.     Despite understanding the consequences of inadequate data security, Saks failed to comply with PCI DSS requirements and failed to take additional protective measures beyond those required by PCI DSS.

66.     Despite understanding the consequences of inadequate data security, Saks operated POS systems with outdated operating systems and software; failed to enable point-to-point and end-to-end encryption; and, failed to take other measures necessary to protect its data network.

_____
[45] FTC, Start With Security, supra note 38.

**CLASS ACTION COMPLAINT**

### E.   The Saks Data Breach

67.   Months before Fin7 successfully breached Saks' security systems, Saks was aware of its lax data-security standards. On March 17, 2017, BuzzFeed News notified HBC that the personal information of tens of thousands of Saks Fifth Avenue customers was publicly available online.[46] According to Robert Graham, cybersecurity expert and owner of Errata Security, "[t]his is bad as security gets … [e]veryone is vulnerable."[47] An HBC spokesperson responded that "[w]e take this matter seriously …[t]he security of our customers is of utmost priority."[48] Once Saks knew that its customers' personal information was exposed to the public, Saks became aware, or should have become aware, that its data-security practices were insufficient.

68.   On April 2017, one month following the March 2017 breach of its customer's personal data, HBC issued its Annual Information Form, admitting that "[a] potential privacy breach could have a material adverse effect on our business and results of operations."[49] HBC further recognized that "[o]ur security measures may be undermined due to the actions of outside parties, employee error, malfeasance, and, as a result, an unauthorized party may obtain access to our data systems and misappropriate business and personal information."[50] HBC was admittedly aware of the severe risks involved in a failure to maintain proper data security standards. Following the March 2017 breach of the personal information of tens of thousands of its customers, immediate action should have been taken to increase the pre-existing data security measures in place for Saks stores. Saks failed to do so.

---

[46] Leticia Miranda, *Saks Fifth Avenue Exposed Personal Info on Tens of Thousands of Customers* (March 19, 2017), *available at* https://www.buzzfeed.com/leticiamiranda/saks-fifth-avenue-exposed-personal-info?utm_term=.nav JN3B8E#.rrRG2Bpqr (last visited June 7, 2018).

[47] *Id.*

[48] *Id.*

[49] Hudson Bay Company, Annual Information Form, at 61 (Apr. 28, 2017).

[50] *Id.*

19

**CLASS ACTION COMPLAINT**

69.     Following these events, on March 28, 2018, the hacking group known as Fin7 announced the breach of an unnamed major corporation, leading to the unauthorized access and disclosure of five million credit and debit cards. Fin7 previously carried out data breaches against Whole Foods, Chipotle, Omni Hotels & Resorts, and Trump Hotels.[51]

70.     On April 1, 2018, Gemini Advisory, a cyber-threat research group working with several large financial institutions, became the first entity to report on the breach, confirming that the breach was linked to the HBC stores, including the Saks OFF 5TH stores involved in this action.[52] The breach of Saks' systems allowed the thieves to extract customers' payment card information from approximately July 1, 2017 to March 31, 2018 for "potentially all Saks Fifth Avenue, Saks OFF 5TH and Lord & Taylor locations in North America."[53] According to Gemini's Chief Technology Officer, the hack "penetrated the retailers' point of sale systems."[54] As of April 1, 2018, approximately 125,000 payment card records have been released for sale, with Gemini experts "expect[ing] the entire cache to become available in the following months."[55]

---

[51] Jackie Wattles, *Saks, Lord & Taylor breach: Data stolen on 5 million cards* (Apr. 1, 2018), *available at* http://money.cnn.com/2018/04/01/technology/saks-hack-credit-debit-card/index.html (last visited June 7, 2018).

[52] Gemini Advisory, *Fin7 Syndicate Hacks Saks Fifth Avenue and Lord & Taylor Stores* (Apr. 1, 2018), *available at* https://geminiadvisory.io/fin7-syndicate-hacks-saks-fifth-avenue-and-lord-taylor/ (last visited June 7, 2018).

[53] Hudson Bay Company, Notice of Data Breach (Apr. 27, 2018), *available at* https://www.oag.ca.gov/system/files/HBC%20-%20Copy%20of%20Notice%20Materials_0.pdf (last visited June 7, 2018).

[54] Robert McMillan and Suzanne Kapner, *Saks, Lord & Taylor Hit With Data Breach* (Apr. 2, 2018), *available at* https://www.wsj.com/articles/saks-lord-taylor-hit-with-data-breach-1522598460 (last visited June 7, 2018).

[55] Gemini Advisory, *Fin7 Syndicate Hacks Saks Fifth Avenue and Lord & Taylor Stores* (Apr. 1, 2018), *available at* https://geminiadvisory.io/fin7-syndicate-hacks-saks-fifth-avenue-and-lord-taylor/ (last visited June 7, 2018).

20

**CLASS ACTION COMPLAINT**

71.    On April 1, 2018, immediately following the Gemini Report, HBC confirmed that hackers breached and disclosed customer payment card data collected from its North American stores, including its Saks OFF 5th stores.[56] Saks failed to provide consumers with any additional information regarding the scope or extent of the breach.[57]

72.    Following the breach, Mark Cline, Vice President of the data-security firm Netsurion, stated that "[t]his incident shows once again merchants still need to protect themselves against POS system infiltration attacks targeting cardholder data. A multi-layer security strategy is necessary."[58] If such measures were in place, "[i]f nothing else, dwell time of such an attack would be reduced to hours or days."[59]

73.    Despite Saks' lax security standards and acknowledgement that its customers' personal information was valuable, the Saks breach occurred two months later, resulting from Saks' acts and omissions in failing to properly protect Customer Data.

74.    In addition to Saks' failure to prevent the data breach, Saks also failed to detect the breach for almost one year, only learning of the breach after the Gemini Report.[60]

75.    The breach occurred because Saks failed to implement adequate data

---

[56] Saks OFF 5TH, *available at* https://www.saksoff5th.com/include/aem/aem_static.jsp?page=security-information-notice&site_refer=EML (last visited June 7, 2018).

[57] *Id.*

[58] Teri Robinson, *Saks, Lord & Taylor breached, 5 million payment cards likely compromised* (Apr. 1, 2018), *available at* https://www.scmagazine.com/saks-lord-taylor-breached-5-million-payment-cards-likely-compromised/article/755180/ (last visited June 7, 2018).

[59] *Id.*

[60] Jim Finkle and David Henry, *Saks, Lord & Taylor hit by payment card data breach* (Apr. 3, 2018), *available at* https://www.reuters.com/article/legal-us-hudson-s-bay-databreach/saks-lord-taylor-hit-by-payment-card-data-breach-idUSKCN1H91W7 (last visited June 7, 2018).

**CLASS ACTION COMPLAINT**

security measures to protect its POS network from the potential danger of a data breach and failed to implement and maintain adequate systems to detect and prevent the breach and resulting harm that it has caused.

76.     Had Saks implemented and maintained adequate safeguards to protect the Customer Data, deter the hackers, and detect the data breach within a reasonable amount of time, it is more likely than not that the breach would have been prevented.

77.     In permitting the data breach to occur, Saks breached its implied agreement with customers to protect their personal and financial information and violated industry standards.

**F.     The Saks Data Breach Caused Harm and Will Result in Additional Fraud**

78.     Due to Saks' failure to timely identify the breach, Fin7 was able to extract sensitive financial data from Saks' customers for approximately one year. Customers, including Plaintiff and Class members, have been left exposed, unknowingly and unwittingly, for months to continued misuse and ongoing risk of misuse of their personal information without being able to take necessary precautions to prevent imminent harm.

79.     The ramifications of Saks' failure to keep Plaintiff's and Class members' data secure are severe.

80.     The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[61]   The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[62]

81.     Personal identifying information is a valuable commodity to identity thieves once the information has been compromised.  As the FTC recognizes, once

---

[61] 17 C.F.R § 248.201 (2013).

[62] *Id.*

**CLASS ACTION COMPLAINT**

identity thieves have personal information, "they can drain your bank account, run up your credit cards, open new utility accounts, or get medical treatment on your health insurance."[63]

82.     Identity thieves can use personal information, such as that of Plaintiff and Class members which Saks failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

83.     Javelin Strategy and Research reports that identity thieves have stolen $112 billion in the past six years.[64]

84.     Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit.   After conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[65]

85.     There may be a time lag between when harm occurs versus when it is discovered, and also between when Customer Data is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

---

[63] Federal Trade Commission, *Warning Signs of Identity Theft*, *available at* https://www.consumer.ftc.gov/articles/0271-warning-signs-identity-theft (last visited June 7, 2018).

[64] *See* https://www.javelinstrategy.com/coverage-area/2016-identity-fraud-fraud-hits-inflection-point (last visited June 7, 2018).

[65] Victims of Identity Theft, 2014 (Sept. 2015) *available at* http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited June 7, 2018).

**CLASS ACTION COMPLAINT**

[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[66]

86.     Plaintiff and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent credit and debit card charges incurred by them and the resulting loss of use of their credit and access to funds, whether or not such charges are ultimately reimbursed by the credit card companies.

### G.     Plaintiff and Class Members Suffered Damages

87.     Plaintiff's and Class members' Consumer Data is private and sensitive in nature and was left inadequately protected by Saks. Saks did not obtain Plaintiff's and Class members' consent to disclose their Customer Data to any other person as required by applicable law and industry standards.

88.     The Saks Data Breach was a direct and proximate result of its failure to properly safeguard and protect Plaintiff's and Class members' Customer Data from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including Saks' failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiff's and Class members' Customer Data to protect against reasonably foreseeable threats to the security or integrity of such information.

---

[66] GAO, Report to Congressional Requesters, at 29 (June 2007), *available at* http://www.gao.gov/new.items/d07737.pdf (last visited June 7, 2018).

**CLASS ACTION COMPLAINT**

89.    Saks had the resources to prevent a breach, particularly considering the aforementioned expansions in Saks retail locations and investments in technology. Saks made significant expenditures to market its products, modernize its retail locations, and revitalize its brand, but neglected to adequately invest in data security, despite the growing number of POS intrusions and several years of well-publicized data breaches.[67]

90.    Had Saks remedied the deficiencies in its POS systems, followed PCI DSS guidelines, and adopted security measures recommended by experts in the field, Saks would have prevented intrusion into its POS systems and, ultimately, the theft of its customers' confidential payment card information.

91.    As a direct and proximate result of Saks' wrongful actions and inaction and the resulting Data Breach, Plaintiff and Class members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports. This time has been lost forever and cannot be recaptured.  In all manners of life in this country, time has constantly been recognized as compensable, for many consumers it is the way they are compensated, and even if retired from the work force, consumers should be free of having to deal with the consequences of a retailer's slippage, as is the case here.

---

[67] Mike Troy, *Surging Hudson's Bay Details Major Investments in Expanding Saks, Saks Off 5th and Store Renovation* (Apr. 5, 2016), *available at* https://www.chainstoreage.com/article/surging-hudsons-bay-details-major-investments-expanding-saks-saks-th-and-store-renovations/ (last visited June 7, 2018).

25

**CLASS ACTION COMPLAINT**

92.    Saks's wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiff's and Class members' Customer Data, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

a.    theft of their personal and financial information;

b.    unauthorized charges on their debit and credit card accounts;

c.    the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their credit/debit card and personal information being placed in the hands of criminals and already misused via the sale of Plaintiff's and Class members' Customer Information on the Internet card black market;

d.    the untimely and inadequate notification of the Data Breach;

e.    the improper disclosure of their Customer Data;

f.    loss of privacy;

g.    money paid for goods purchased at Saks during the period of the Data Breach in that Plaintiff and Class members would not have shopped at Saks' stores, or at least would not have used their payment cards for purchases, had Saks disclosed that it lacked adequate systems and procedures to reasonably safeguard customers' financial and personal information and had Saks provided timely and accurate notice of the Data Breach;

h.    ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

i.    ascertainable losses in the form of deprivation of the value of their Customer Dat, for which there is a well-established national and international market;

**CLASS ACTION COMPLAINT**

j.    ascertainable losses in the form of the loss of cash back or other benefits as a result of their inability to use certain accounts and cards affected by the Data Breach;

k.    loss of use of and access to their account funds and costs associated with the inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit including adverse credit notations; and

l.    the loss of productivity and value of their time spent to address attempts to ameliorate, mitigate and deal with the actual and future consequences of the data breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with all such issues resulting from the Data Breach.

93.    While the Plaintiff's and Class members' Consumer Data has been stolen, Saks continues to hold Customer Data of consumers, including Plaintiff's and Class members'. Particularly because Saks has demonstrated an inability to prevent a breach or detect it after running unhindered for approximately one year, Plaintiff and members of the Class have an undeniable interest in ensuring that their Customer Data is secure, remains secure, is properly and promptly destroyed and is not subject to further theft.

## CLASS ALLEGATIONS

94.    Plaintiff seeks relief on behalf of herself and as the representative of all others who are similarly situated. Pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3), Plaintiff seeks to certify a class of all persons residing in the United States who made a credit or debit card purchase at any affected Saks OFF 5TH store from July 1, 2017 through March 31, 2018 (the "Nationwide Class").

**CLASS ACTION COMPLAINT**

95.    Pursuant to Fed. R. Civ. P. 23, and in the alternative to claims asserted on behalf of the Nationwide Class, Plaintiff also seeks to certify a class of all persons residing in California who made a credit or debit card purchase at any affected Saks OFF 5TH store from July 1, 2017 to March 31, 2018 (the "California Subclass").

96.    The Nationwide Class and California Subclass are individually referred to as "Class" and collectively referred to as the "Classes."

97.    Excluded from each of the Classes is Defendant and any of its parents or subsidiaries, any entities in which they have a controlling interest, as well as its officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns. Also excluded are any Judges to whom this case is assigned as well as his or her judicial staff and immediate family members.

98.    Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery.

99.    Plaintiff is a member of both Classes.

100.    Each of the proposed Classes meets the criteria for certification under Federal Rule of Civil Procedure 23(a), (b)(2), and (b)(3):

101.    **Numerosity.** The proposed Classes include millions of customers whose data was compromised in the Saks data breach. While the precise number of Class members has not yet been determined, the massive size of the Saks data breach indicates that joinder of each member would be impracticable.

102.    **Commonality.** Common questions of law and fact exist and predominate over any questions affecting only individual Class members. The common questions include:

a.    Whether Saks had a duty to protect Customer Data;

b.    Whether Saks knew or should have known of the susceptibility of their POS system to a data breach;

c.      Whether Saks' security measures to protect their POS systems were reasonable in light of the PCI DSS requirements, FTC data security recommendations, and other measures recommended by data security experts;

d.      Whether Saks was negligent in failing to implement reasonable and adequate security procedures and practices;

e.      Whether Saks' failure to implement adequate data security measures allowed the breach of its POS systems to occur;

f.      Whether Saks' conduct constituted unfair, unlawful, and/or deceptive trade practices under California law;

g.      Whether Saks' conduct, including its failure to act, resulted in or was the proximate cause of the breach of its systems, resulting in the loss of the Customer Data of Plaintiffs and Class members;

h.      Whether Saks' breaches of its legal duties caused Plaintiff and the Class members to suffer damages;

i.      Whether Saks was negligent as a result of its possible violations of relevant statutes, such as Cal. Civ. Code Sections 1798.81.5 and/or 1798.82;

j.      Whether Plaintiff and Class members are entitled to recover damages; and

k.      Whether Plaintiff and Class members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

103.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff's claims are typical of the claims of the Classes. Plaintiff and Class members were injured through Saks' uniform misconduct and their legal claims arise from the same core practices employed or omitted by Saks.

104.   **Adequacy. Fed. R. Civ. P. 23(a)(4).** Plaintiff is an adequate representative of the proposed Classes because her interests do not conflict with the

**CLASS ACTION COMPLAINT**

1   interests of the Class members she seeks to represent. Plaintiff's counsel are
2   experienced in litigating consumer class actions and complex commercial disputes, and
3   include lawyers who have successfully prosecuted similarly massive retail data breach
4   cases.

5   105.  **Superiority. Fed. R. Civ. P. 23(a)(5).** A class action is superior to all
6   other available methods of fairly and efficiently adjudicating this dispute. The injury
7   sustained by each Class member, while meaningful on an individual basis, is not of
8   such magnitude that it is economically feasible to prosecute individual actions against
9   Saks. Even if it were economically feasible, requiring millions of injured plaintiffs to
10  file individual suits would impose a crushing burden on the court system and almost
11  certainly lead to inconsistent judgments. By contrast, class treatment will present far
12  fewer management difficulties and provide the benefits of a single adjudication,
13  economies of scale, and comprehensive supervision by a single court.

14  106.  **Injunctive and Declaratory Relief.** Class certification is also appropriate
15  under Fed. R. Civ. P. 23(b)(2) and (c). Saks has acted or has refused to act on grounds
16  generally applicable to the Classes, so that final injunctive relief or corresponding
17  declaratory relief is appropriate as to the Classes as a whole.

18  107.  Finally, all members of the proposed Classes are readily ascertainable.
19  Saks has access to information regarding which of its stores were affected by the
20  breach, the time period of the breach, which customers were potentially affected, as
21  well as the addresses and other contact information for members of the Classes, which
22  can be used for providing notice to the Class members.

23                              **COUNT I**
24              **BREACH OF IMPLIED CONTRACT**
    **(ON BEHALF OF PLAINTIFF AND THE CLASSES OR, ALTERNATIVELY,**
25              **PLAINTIFF AND THE CALIFORNIA SUBCLASS)**

26  108.  Plaintiff restate and reallege Paragraphs 1 through 107 as if fully set forth
27  herein.

28

30

**CLASS ACTION COMPLAINT**

109.   Saks solicited and invited Plaintiff and Class members to shop at its retail stores and make purchases using their credit or debit cards. Plaintiff and Class members accepted Saks' offers and used their credit or debit cards to make purchases at Saks stores from July 1, 2017 through March 31, 2018.

110.   When Plaintiff and Class members made and paid for purchases of Saks services and products from July 1, 2017 through March 31, 2018, they provided their Customer Data to Saks. In so doing, Plaintiff and Class members entered into implied contracts with Saks pursuant to which Saks agreed to safeguard and protect such information and to timely detect any breaches of their Customer Data.

111.   Plaintiff and Class members would not have provided and entrusted their Customer Data with Saks in the absence of the implied contract between them and Saks.

112.   Plaintiffs and Class members fully performed their obligations under the implied contracts with Saks.

113.   Saks' obligations under the implied contracts were to be executed in Mississippi, as its corporate point-of-sale system and IT personnel operate out of and are located at Saks' operations center in Jackson, Mississippi.

114.   Saks breached the implied contracts it made with Plaintiff and Class members by failing to safeguard and protect their Consumer Data and by failing to timely detect the data breach within a reasonable time.

115.   As a direct and proximate result of Saks' breaches of the implied contracts between Saks and Plaintiffs and Class members, Plaintiffs and Class members sustained actual losses and damages as described in detail above.

**CLASS ACTION COMPLAINT**

## COUNT II

### NEGLIGENCE
### (ON BEHALF OF PLAINTIFF AND THE CLASSES OR, ALTERNATIVELY, PLAINTIFF AND THE CALIFORNIA SUBCLASS)

116.   Plaintiff restates and realleges Paragraphs 1 through 115 as if fully set forth herein.

117.   Upon accepting and storing the Plaintiff's and Class members' Customer Data in its computer systems and on its networks, Saks undertook and owed a duty to Plaintiff and Class members to exercise reasonable care to secure and safeguard that information and to use commercially reasonable methods to do so. Saks knew that the Customer Data was private and confidential and should be protected as private and confidential.

118.   Saks owed a duty of care not to subject Plaintiff's and Class members' Customer Data to an unreasonable risk of harm because they were foreseeable and probable victims of any inadequate security practices.

119.   Saks owed numerous duties to Plaintiff and Class members, including the following:

a.   to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting and protecting Customer Data in its possession;

b.   to protect Customer Data using reasonable and adequate security procedures and systems that are compliant with industry-standard practices; and

c.   to implement processes to quickly detect a data breach and to timely act on warnings about data breaches.

120.   Saks also breached its duty to Plaintiff and Class members to adequately protect and safeguard Customer Data by knowingly disregarding standard information security principles, despite obvious risks, and by allowing unmonitored and unrestricted access to unsecured Customer Data. Furthering their dilatory practices,

**CLASS ACTION COMPLAINT**

Saks failed to provide adequate supervision and oversight of the Customer Data with which they were and are entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted a malicious third party to gather Customer Data of Plaintiff and Class members, misuse the Customer Data and intentionally disclose it to others without consent.

121.    Saks knew, or should have known, of the risks inherent in collecting and storing Customer Data, the vulnerabilities of POS systems, and the importance of adequate security.  Saks knew about numerous, well-publicized data breaches within the retail industry, including its own security failures in the March 2017 public disclosure of customer's private information.

122.    Saks knew, or should have known, that their data systems and networks did not adequately safeguard Plaintiff's and Class Members' Customer Data.

123.    Saks breached its duties to Plaintiff and Class Members by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' Customer Data.

124.    Because Saks knew that a breach of its systems would damage millions of its customers, including Plaintiff and Class members, Saks had a duty to adequately protect their data systems and the Customer Data contained thereon.

125.    Saks had a special relationship with Plaintiff and Class members. Plaintiff's and Class members' willingness to entrust Saks with their Customer Data was predicated on the understanding that Saks would take adequate security precautions.  Moreover, only Saks had the ability to protect its systems and the Customer Data it stored on them from attack.

126.    Saks' own conduct also created a foreseeable risk of harm to Plaintiff and Class members and their Customer Data.  Saks' misconduct included failing to: (1) secure its point-of-sale systems, despite knowing their vulnerabilities; (2) comply with industry standard security practices; (3) implement adequate system and event

**CLASS ACTION COMPLAINT**

monitoring; and (4) implement the systems, policies, and procedures necessary to prevent this type of data breach.

127. Saks also had independent duties under state and federal laws that required it to reasonably safeguard Plaintiff's and Class members' Personal Information and promptly notify them about the data breach.

128. Saks breached its duties to Plaintiff and Class members in numerous ways, including:

    a.    by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class members' customer data;

    b.    by creating a foreseeable risk of harm through the misconduct previously described;

    c.    by failing to implement adequate security systems, protocols and practices sufficient to protect Plaintiff's and Class members' Customer Data both before and after learning of the Data Breach;

    d.    by failing to comply with the minimum industry data security standards during the period of the Data Breach; and

    e.    by failing to timely and accurately disclose that Plaintiff's and Class members' customer data had been improperly acquired or accessed.

129. Through Saks' acts and omissions described in this Complaint, including Saks' failure to provide adequate security and its failure to protect Customer Data of Plaintiff and Class members from being foreseeably captured, accessed, disseminated, stolen and misused, Saks unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiff's and Class members' Customer Data during the time it was within Saks' possession or control.

130. The law further imposes an affirmative duty on Saks to timely disclose the unauthorized access and theft of the Customer Data to Plaintiff and the Class members

**CLASS ACTION COMPLAINT**

so that they can take appropriate measures to mitigate damages, protect against adverse consequences, and thwart future misuse of their Customer Data.

131.   Saks breached its duty to notify Plaintiff and Class Members of the unauthorized access by not disclosing the breach as required by California's data breach law. To date, Saks has not provided sufficient information to Plaintiff and Class Members regarding the extent of the unauthorized access and continues to breach its disclosure obligations to Plaintiff and the Class.

132.   Through Saks' acts and omissions described in this Complaint, including Saks' failure to provide adequate security and its failure to protect Plaintiff's and Class members' Customer Data from being foreseeably captured, accessed, disseminated, stolen and misused, Saks unlawfully breached its duty to use reasonable care to adequately protect and secure Plaintiff's and Class members' Customer Data during the time it was within Saks' possession or control.

133.   Further, through its failure to discover the breach for approximately one year, Saks prevented Plaintiff and Class members from taking meaningful, proactive steps to secure their financial data and bank accounts.

134.   Upon information and belief, Saks improperly and inadequately safeguarded Plaintiff's and Class members' Customer Data in deviation of standard industry rules, regulations, and practices at the time of the unauthorized access. Saks' failure to take proper security measures to protect sensitive Plaintiff's and Class members' Customer Data, as described in this Complaint, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access of the Customer Data.

135.   Saks' conduct was grossly negligent and departed from all reasonable standards of care, including, but not limited to: failing to adequately protect the Customer Data; failing to conduct regular security audits; failing to provide adequate and appropriate supervision of persons having access to Plaintiff's and Class members'

**CLASS ACTION COMPLAINT**

Customer Data; and failing to provide Plaintiff and Class members with timely and sufficient notice that their sensitive Customer Data had been compromised.

136.   Neither Plaintiff nor the other Class members contributed to the Data Breach and subsequent misuse of their Customer Data as described in this Complaint.

137.   As a direct and proximate cause of Saks' conduct, Plaintiff and the Class members suffered damages including, but not limited to: damages arising from the unauthorized charges on their debit or credit cards or on cards that were fraudulently obtained through the use of the their Customer Data; damages arising from Class members' inability to use their debit or credit cards because those cards were cancelled, suspended, or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including, but not limited to, late fees charged and foregone cash back rewards; damages from lost time and effort to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy. The nature of other forms of economic damage and injury may take years to detect, and the potential scope can only be assessed after a thorough investigation of the facts and events surrounding the theft mentioned above.

## COUNT III
### VIOLATIONS OF CAL. CIV. CODE SECTIONS 1798.81.5 & 1798.82
### (ON BEHALF OF PLAINTIFF AND THE CALIFORNIA SUBCLASS)

138.   Plaintiff repeats the allegations contained in paragraphs 1-137 above as if fully set forth herein.

139.   Cal Civ. Code § 1798.81.5(a)(1) provides that its purpose is to "ensure

**CLASS ACTION COMPLAINT**

that personal information about California residents is protected. To that end, the purpose of this section is to encourage businesses that own, license, or maintain personal information about Californians to provide reasonable security for that information."

140.   Cal. Civ. Code § 1798.81.5(b) provides, in pertinent part, that "[a] business that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

141.   Under Cal Civ. Code § 1798.81.5(d)(1)(A)(i-iv), "personal information," as described in Cal Civ. Code § 1798.81.5(b), means the following:

(A) [a]n individual's first name or first initial and his or her last name in combination with any one or more of the following data elements, when either the name or the data elements are not encrypted or redacted:

(i) Social security number.

(ii) Driver's license number or California identification card number.

(iii) Account number, ***credit or debit card number***, in combination with any required security code, access code, or password that would permit access to an individual's financial account.

(emphasis added).

142.   Therefore, the Customer Data disclosed in the Saks Breach, which includes Plaintiff and Class members' credit and debit card information, combined with the necessary codes and/or passwords, falls within the meaning of "personal information" under Cal. Civ. Code Section 1798.81.5.

143.   By failing to implement adequate and reasonable data security measures for this Customer Data, Saks violated Cal. Civ. Code Section 1798.81.5.

144.   Under Cal. Civ. Code Section 1798.82(a), businesses which conduct

business in California and who own or license computerized data which include personal information are required to disclose breaches to California residents "whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person [. . .] [and] [t]he disclosure shall be made in the most expedient time possible and without unreasonable delay."

145.   Under Cal. Civ. Code Section 1798.82(d)(1), the disclosure must also "be written in plain language, shall be titled 'Notice of Data Breach,' and shall present the information [. . .] under the following headings: 'What Happened,' 'What Information Was Involved,' 'What We Are Doing,' 'What You Can Do,' and 'For More Information.'"

146.   Because Saks, as of the date of this Complaint, has not provided written notifications to California Residents as required under Cal. Civ. Code Section 1798.82(d)(1), Saks continues to violate Cal. Civ. Code Section 1798.82(d)(1).

147.   Because Saks violated Cal. Civ. Code Sections 1798.81.5 and 1798.82, and continues to violate Cal. Civ. Code Section 1798.82, Plaintiff may seek an injunction pursuant to Cal. Civ. Code Section 1798.84(e), which states "[a]ny business that violates, proposes to violate, or has violated this title may be enjoined." Specifically, Plaintiff seeks injunctive relief as follows -- Saks must implement and maintain adequate and reasonable data security measures and abide by the California Data Breach laws, including, but not limited to:

a.    hiring third-party security auditors and penetration testers in addition to internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Saks' systems periodically, and ordering Saks to promptly rectify any flaws or issues detected by such parties;

b.    as required by Cal. Civ. Code Section 1798.81.5, "implement and maintain reasonable security procedures and practices appropriate to the

**CLASS ACTION COMPLAINT**

1              nature of the information, to protect the personal information from

2              unauthorized access, destruction, use, modification, or disclosure.";

3    c.       engaging third-party security auditors and internal personnel to run

4              automated security monitoring;

5    d.       testing, auditing, and training its security personnel regarding any and all

6              new and/or modified security measures or procedures;

7    e.       creating further and separate protections for customer data including, but

8              not limited to, the creation of firewalls and access controls so that if one

9              area of Saks' data security measures are compromised, hackers cannot

10              gain access to other areas of Saks' systems;

11    f.       deleting, in a reasonable and secure manner, Personal Information not

12              necessary for Saks' provisions of services;

13    g.       conducting regular database scanning and security checks;

14    h.       issue security breach notifications to California Residents which abide by

15              the requirements established under Cal. Civ. Code Section 1798.82(d);

16    i.       conducting routine and periodic training and education to prepare internal

17              security personnel regarding the processes to identify and contain a breach

18              when it occurs and what appropriate actions are proper in response to a

19              breach; and

20    j.       educating its customers about the threats they face as a result of the loss

21              of their financial and personal information to third parties, as well as the

22              steps customers must take to protect themselves.

23

24

25

26

27

28

**CLASS ACTION COMPLAINT**

## COUNT IV
## NEGLIGENCE PER SE
## (ON BEHALF OF PLAINTIFF AND THE CLASSES)

On Behalf of the California Subclass

148.   Plaintiff restates and realleges Paragraphs 1 through 147 as if fully set forth herein.

149.   Section 1798.81.5(b) of the California Civil Code establishes that any "business that owns, licenses, or maintains personal information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure."

150.   Saks violated Section 1798.81.5(b) of the California Civil Code by failing to implement and maintain reasonable security procedures and practices necessary to protect Plaintiff and Class members' private information from unauthorized access, particularly considering its earlier failure to safeguard its customers' private information.

151.   Saks' violation of Section 1798.81.5(b) of the California Civil Code thereby constitutes negligence per se.

152.   Plaintiff and Class members are within the class of persons that California Civil Code Section 1798.81.5(b) was intended to protect because they are California residents.

153.   The harm which occurred due to Saks' Data Breach is the type of harm that California Civil Code Section 1798.81.5(b) was intended to protect. Specifically, this is the harm of the unauthorized access or disclosure of personal information due to a failure to maintain reasonable security procedures.

154.   Therefore, the harm that occurred as a result of Saks' Data Breach is the type of harm Section 1798.81.5(b) of the California Civil Code was created to protect.

On Behalf of the Classes

155.   Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Saks, of failing to use reasonable measures to protect Customer Data.  The FTC publications and orders described above also form part of the basis of Saks' duty in this regard.

156.   Saks violated Section 5 of the FTC Act by failing to use reasonable measures to protect Customer Data and not complying with applicable industry standards, as described in detail herein.  Saks' conduct was particularly unreasonable given the nature and amount of Customer Data it obtained and stored, and the foreseeable consequences of a data breach at an international retail chain as large as Saks, including, specifically, the immense damages that would result to Plaintiff and Class members.

157.   Saks' violation of Section 5 of the FTC Act constitutes negligence *per se*.

158.   Plaintiff and Class members are within the class of persons that the FTC Act was intended to protect.

159.   The harm that occurred as a result of the Saks' Data Breach is the type of harm the FTC Act was intended to guard against.  The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

160.   As a direct and proximate result of Saks' negligence *per se*, Plaintiff and the Class have suffered, and continue to suffer, injuries and damages arising from their inability to use their debit or credit cards because those cards were cancelled, suspended, or otherwise rendered unusable as a result of the Data Breach and/or false or fraudulent charges stemming from the Data Breach, including, but not limited to, late fees charged and foregone cash back rewards; damages from lost time and effort

to mitigate the actual and potential impact of the Data Breach on their lives including, inter alia, by placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, and filing police reports and damages from identity theft, which may take months if not years to discover and detect, given the far-reaching, adverse and detrimental consequences of identity theft and loss of privacy.

## COUNT V
## UNJUST ENRICHMENT
## (ON BEHALF OF PLAINTIFF AND THE CLASSES OR, ALTERNATIVELY, PLAINTIFF AND THE CALIFORNIA SUBCLASS)

161.    Plaintiff restates and realleges Paragraphs 1 through 160 as if fully set forth here.

162.    Plaintiff and Class members conferred a monetary benefit on Saks. Specifically, they purchased goods and services from Saks and provided Saks with their payment information.  In exchange, Plaintiff and Class members should have received from Saks the goods and services that were the subject of the transaction and should have been entitled to have Saks protect their Customer Data with adequate data security.

163.    Saks knew that Plaintiff and Class members conferred a benefit on HBC and accepted and has accepted or retained that benefit. Saks profited from the purchases and used Plaintiff's and Class members' Customer Data for business purposes.

164.    Saks failed to secure Plaintiff's and Class members' Customer Data and, therefore, did not provide full compensation for the benefit the Plaintiff's and Class members' Customer Data provided.

165.    Saks acquired the Customer Data through inequitable means as it failed to disclose the inadequate security practices previously alleged.

**CLASS ACTION COMPLAINT**

166.   If Plaintiff and Class members knew that Saks would not secure their Customer Data using adequate security, they would not have made purchases at Saks' stores.

167.   Plaintiff and Class members have no adequate remedy at law.

168.   Under the circumstances, it would be unjust for Saks to be permitted to retain any of the benefits that Plaintiff and Class members conferred on it.

169.   Saks should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class members, proceeds that it unjustly received from them. In the alternative, Saks should be compelled to refund the amounts that Plaintiff and Class members overpaid.

## COUNT VI
## DECLARATORY JUDGMENT
## (ON BEHALF OF PLAINTIFF AND THE CLASSES OR, ALTERNATIVELY, PLAINTIFF AND THE CALIFORNIA SUBCLASS)

170.   Plaintiff restates and realleges Paragraphs 1 through 169 as if fully set forth here.

171.   As previously alleged, Plaintiff and Class members entered into an implied contract that required Saks to provide adequate security for the Customer Data it collected from their payment card transactions. As previously alleged, Saks owes duties of care to Plaintiff and Class members that require it to adequately secure Customer Data.

172.   Saks still possesses Customer Data pertaining to Plaintiff and Class members.

173.   Saks has made no announcement or notification that it has remedied the vulnerabilities in its computer data systems, and, most importantly, its POS systems.

174.   Accordingly, Saks has not satisfied its contractual obligations and legal duties to Plaintiff and Class members.  In fact, now that Saks' lax approach towards

data security has become public, the Customer Data in its possession is more vulnerable than previously.

175. Actual harm has arisen in the wake of the Saks Data Breach regarding Saks' contractual obligations and duties of care to provide data security measures to Plaintiff and Class members.

176. Plaintiff, therefore, seeks a declaration that: (a) Saks' existing data security measures do not comply with its contractual obligations and duties of care; and (b) in order to comply with its contractual obligations and duties of care, Saks must implement and maintain reasonable security measures, including, but not limited to:

a. hiring third-party security auditors and penetration testers in addition to internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Saks' systems periodically, and ordering Saks to promptly rectify any flaws or issues detected by such parties;

b. as required by Cal. Civ. Code Section 1798.81.5, "implement[ing] and maintain[ing] reasonable security procedures and practices appropriate to the nature of the information, to protect the personal information from unauthorized access, destruction, use, modification, or disclosure.";

c. engaging third-party security auditors and internal personnel to run automated security monitoring;

d. testing, auditing, and training its security personnel regarding any and all new and/or modified security measures or procedures;

e. creating further and separate protections for customer data including, but not limited to, the creation of firewalls and access controls so that if one area of Saks' data security measures are compromised, hackers cannot gain access to other areas of Saks' systems;

f. deleting, in a reasonable and secure manner, Personal Information not necessary for Saks' provisions of services;

**CLASS ACTION COMPLAINT**

1     g.    conducting regular database scanning and security checks;

2     h.    issuing security breach notifications to California Residents which abide

3            by the requirements established under Cal. Civ. Code Section 1798.82(d);

4     i.    conducting routine and periodic training and education to prepare internal

5            security personnel regarding the processes to identify and contain a breach

6            when it occurs and what appropriate actions are proper in response to a

7            breach; and

8     j.    educating its customers about the threats they face as a result of the loss

9            of their financial and personal information to third parties, as well as the

10           steps customers must take to protect themselves.

### COUNT VII
**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW ("UCL"),
CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200*, ET SEQ.*
(ON BEHALF OF PLAINTIFF AND THE CLASSES OR, ALTERNATIVELY,
PLAINTIFF AND THE CALIFORNIA SUBCLASS)**

177.   Plaintiff repeats the allegations contained in paragraphs 1-176 above as if fully set forth herein.

178.   UCL § 17200 provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair, or fraudulent business practices [. . .]".

179.   Under the UCL, a business act or practice is "unlawful" if the act or practice violates any established state or federal law.

180.   Saks' failures to implement and maintain reasonable security measures and to timely and properly notify Plaintiff and Class members of the data breach therefore was and continues to be "unlawful" as Saks breached its implied and express warranties and violated the California laws regarding data breaches, specifically California Code of Civil Procedure Sections 1798.81.5(b) and 1798.82, as well as Section of the FTC Act.

181.   As a result of Saks' unlawful business acts and practices, Saks unlawfully

1    obtained money from Plaintiff and members of the Class.

2    182.   Under the UCL, a business act or practice is "unfair" if the defendant's

3    conduct is substantially injurious to consumers, goes against public policy, and is

4    immoral, unethical, oppressive, and unscrupulous, as the benefits for committing these

5    acts or practices are outweighed by the severity of the harm to the alleged victims.

6    183.   Here, Saks' conduct was and continues to be of no benefit to its customers,

7    as it is both injurious and unlawful to those persons who rely on Saks' duties and

8    obligations to maintain and implement reasonable data security measures and to

9    monitor for breaches. Having lax data security measures that has resulted in the

10   disclosure of millions of customers' payment card information provides no benefit to

11   consumers. For these reasons, Saks' conduct was and continues to be "unfair" under

12   the UCL.

13   184.   As a result of Saks' unfair business acts and practices, Saks has unfairly

14   and unlawfully obtained money from Plaintiff and members of the Class.

15   185.   Plaintiff requests that this Court enjoin Saks from violating the UCL or

16   violating the UCL in the same way in the future, as discussed herein. Otherwise,

17   Plaintiff and members of the Class may be irreparably harmed and/or denied an

18   effective and complete remedy if such an order is not granted.

19   186.   Plaintiff re-alleges and incorporates by reference each preceding

20   paragraph as though set forth at length herein.

21                              **REQUEST FOR RELIEF**

22       WHEREFORE, Plaintiff, individually and on behalf of all others similarly

23   situated, seeks judgment against Defendant as follows:

24       a)    For an order certifying the Nationwide Class, the California Subclass,

25   and the California Consumer Subclass, under Rule 23 of the Federal Rules of Civil

26   Procedure; naming Plaintiff as representative of all Classes; and naming Plaintiff's

27   attorneys as Class Counsel to represent all Classes;

28

**CLASS ACTION COMPLAINT**

1      b)     For an order declaring that Defendant's conduct violates the statutes

2 and laws referenced herein;

3      c)     For an order finding in favor of Plaintiff, and all Classes, on all counts

4 asserted herein;

5      d)     For an order awarding all damages in amounts to be determined by the

6 Court and/or jury;

7      e)     For prejudgment interest on all amounts awarded;

8      f)     For interest on the amount of any and all economic losses, at the

9 prevailing legal rate;

10      g)     For an order of restitution and all other forms of equitable monetary

11 relief;

12      h)     For injunctive relief as pleaded or as the Court may deem proper;

13      i)     For an order awarding Plaintiff and all Classes their reasonable

14 attorneys' fees, expenses and costs of suit, including as provided by statute such as

15 under the Federal Rules of Civil Procedure 23(h) and California Code of Civil

16 Procedure section 1021.5; and

17      j)     For any other such relief as the Court deems just and proper.

18 **<u>DEMAND FOR TRIAL BY JURY</u>**

19      Plaintiff demands a trial by jury on all issues so triable.

20

21 Dated: June 8, 2018                      **FARUQI & FARUQI, LLP**

22

23

24                               By: *<u>/s/ Benjamin Heikali</u>*

25                               Benjamin Heikali, Bar No. 307466

26                               Joshua Nassir, Bar No. 318344

27                               10866 Wilshire Blvd., Suite 1470
Los Angeles, CA 90024

28                               Telephone: 424.256.2884
Fax: 424.256.2885

47

**CLASS ACTION COMPLAINT**

E-mail: bheikali@faruqilaw.com
E-mail: jnassir@faruqilaw.com

**CLASS ACTION COMPLAINT**