**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE HUDSON'S BAY COMPANY DATA SECURITY INCIDENT CONSUMER LITIGATION | Case No. 1:18-cv-08472 (PKC) |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTIONS FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND AWARD OF ATTORNEYS' FEES, REIMBURSEMENT OF <u>EXPENSES, AND SERVICE AWARDS</u>**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ............................................................................................. 1

II.     THE CLAIMS PROCESS IS COMPLETE AND THE RESPONSE OF THE CLASS
        WAS CONSISTENT WITH OTHER CASES INVOLVING DATA BREACHES.......... 3

III.    THE NOTICE WAS THE BEST PRACTICABLE UNDER THE CIRCUMSTANCES
        AND SATISFIED DUE PROCESS UNDER RULE 23 .................................................. 6

IV.     UNDER SUPREME COURT AND SECOND CIRCUIT AUTHORITY, THE VALUE
        OF THE SETTLEMENT SHOULD BE BASED ON THE BENEFITS MADE
        AVAILABLE TO THE CLASS ..................................................................................... 13

V.      CONCLUSION.......................................................................................................... 21

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                        **Page(s)**

*In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*,
    271 F. App'x 41 (2d Cir. 2008) ......................................................................................7, 13

*Alleyne v. Time Moving & Storage Inc.*,
    264 F.R.D. 41 (E.D.N.Y. 2010) ............................................................................................18

*Ark. Fed. Credit Union v. Hudson's Bay Co.*,
    No. 1:19-cv-4492 (PKC) ........................................................................................................15

*Beckman v. KeyBank, N.A.*,
    293 F.R.D. 467 (S.D.N.Y. 2013) ...........................................................................................21

*Behzadi v. Int'l Creative Mgmt. Partners, LLC*,
    No. 14-cv-4382 (LGS), 2015 WL 4210906 (S.D.N.Y. July 9, 2015)....................................15

*Boeing Co. v. Van Gemert*,
    444 U.S. 472 (1980) ..................................................................................................13, 14, 15

*Brown v. 22nd Dist. Agricultural Ass'n*,
    No. 15-cv-2578-DHB, 2017 WL 2172239 (S.D. Cal. 2017).................................................10

*In re: Certainteed Fiber Cement Siding Litig.*,
    MDL 2270, ECF Nos. 87-5, 119 ...........................................................................................11

*Corona v. Sony Pictures Entm't*,
    No. 2:14-cv-9600 (C.D. Cal.), ECF 145-1 & ECF 164 .........................................................5

*In re Dental Supplies Antitrust Litig.*,
    No. 1:16-cv-00696-BMC-GRB, ECF Nos. 328 (E.D.N.Y. June 25, 2019) ...........................19

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974)..................................................................................................................6

*Evans v. Linden Research, Inc.*,
    No. 4:11-cv-01078, ECF No. 136 ..........................................................................................11

*Fleisher v. Phoenix Life Ins. Co.*,
    No. 11-CV-8405 (CM), 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015)................................20

*Gascho v. Global Fitness Holdings, LLC*,
    822 F.3d 269 (6th Cir. 2016) ................................................................................................18

*Geanacopoulos v. Philip Morris USA, Inc.*
    Civil Action No. 98-6002-BLS1 (Super. Ct. of the Commonwealth of Mass.) .....................11

*Goldberger v. Integrated Res., Inc.*,
  209 F.3d 43 (2d Cir. 2000)..................................................................................13

*Gordon v. Chipotle Mexican Grill*,
  No. 1:17-cv-01415 (D. Colo.), ECF 103 & ECF 102-3..........................................5

*Guevoura Fund Ltd. V. Sillerman*,
  No. 1:15-cv-07192-CM, 2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ...............21

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
  851 F. Supp. 2d 1040 ..........................................................................................4

*Huyer v. Buckley*,
  849 F.3d 395 (8th Cir. 2017) .............................................................................19

*Kaufman v. Am. Exp. Travel Related Servs., Inc.*,
  283 F.R.D. 404 (N.D. Ill. 2012)...........................................................................8

*Kobylanski v. Motorola Mobility*,
  No. 2:13-cv-01181 (W.D. Pa.), ECF No. 43.......................................................11

*Kukorinis v. Walmart, Inc.*,
  No. 1:19-cv-20592-JEM (S.D. Fla. 2021) .........................................................8, 9

*In re: LinkedIn User Privacy Litig.*,
  No. 12-cv-03088-EJD (N.D. Cal.), ECF 122 & ECF 145-2 ....................................5

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
  No. 04 Civ. 8144(CM), 2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009)....................6

*Masters v. Wilhelmina Model Agency, Inc.*,
  473 F.3d 423 (2d Cir. 2007).........................................................................14, 19

*Mayhew, et al. v. KAS Direct, LLC, et al.*,
  No. 7:16-cv-06981-VB, ECF Nos. 133 (S.D.N.Y. Nov. 30, 2018) .......................19

*Mirakay v. Dakota Growers Pasta Co.*,
  No. 13-cv-4429 (JAP), 2014 WL 5358987 (D.N.J. Oct. 20, 2014).........................8

*In re Nassau Cnty. Strip Search Cases*,
  12 F. Supp. 3d 485 (E.D.N.Y. 2014) ..................................................................14

*In re Nigeria Charter Flights Litig.*,
  No. 04-CV-304, 2011 WL 7945548 (E.D.N.Y. Aug. 25, 2011)............................14

*Park v. FDM Grp., Inc.*,
  No. 16-CV-1520 (LTS)(SN), 2021 WL 227339 (S.D.N.Y. Jan. 22, 2021)............14

iii

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
    330 F.R.D. 11 (E.D.N.Y. 2019) ..................................................................................20

*Plubell, v. Merck and Co.*,
    No. 04CV235817-01 ..................................................................................................11

*Poertner v. Gillette Co.*,
    618 F. Appx. 624 (11th Cir. 2015)............................................................................18

*Raniere v. Citigroup Inc.*,
    310 F.R.D. 211 (S.D.N.Y. 2015) ..............................................................................19

*Rapoport-Hecht v. Seventh Generation, Inc.*,
    No. 14-CV-9087 (KMK), ECF No. 60 ......................................................................19

*In re Signet Jewelers Ltd. Sec. Litig.*,
    No. 1:16-cv-06728-CM-SDA, 2020 WL 4196468 (S.D.N.Y. July 21, 2020)........................13

*Skold v. Intel Corp.*,
    No. 1-05-cv-039231 (Super. Ct. of Santa Clara, CA) .................................................11

*Target Corp. Customer Data Sec. Breach Litig.*, MDL No. 14-2522 (D. Minn.),
    ECF 615 .....................................................................................................................5

*Tesauro v. Quigley Corp.*,
    59 Pa. D. & C.4th 35 (Com. Pl. 2002) ......................................................................11

*In re: The Home Depot Inc. Customer Data Sec. Breach Litig.*,
    No. 1:14-md-02583 (N.D. Ga.), ECF 181-1 & ECF 245-1 .....................................5

*Torres v. Gristede's Operating Corp.*,
    519 F. Appx. 1 (2d Cir. 2013).............................................................14, 19, 20, 21

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005).........................................................................................7

*Waters v. Int'l Precious Metals Corp.*,
    190 F.3d 1291 (11th Cir. 1999) ...............................................................................18

*Weeks v. Kellogg Co.*,
    No. CV 09-08102(MMM)(RZx), 2013 WL 6531177 (C.D. Cal. 2013).................................10

*Williams v. MGM-Pathe Commc'n Co.*,
    129 F.3d 1026 (9th Cir. 1997) .................................................................................17

*Zink v. First Niagara Bank, N.A.*,
    No. 13-CV-01076-JJM, 2016 WL 7473278 (W.D.N.Y. Dec. 29, 2016)....................15, 17, 18

**Other Authorities**

FED. JUDICIAL CTR., "Judges' Class Action Notice and Claims Process Checklist
and Plain Language Guide 3", (2010) ..................................................................................8

Fed. R. Civ. P. 23 .............................................................................................3, 6, 7, 13

Joseph M. McLaughlin, § 5:81 Rule 23(b)(3)— "Best notice practicable under the
circumstances"—Methods of providing notice, 1 McLaughlin on Class
Actions § 5:81(18th ed.) ......................................................................................10

Marcia G. Robeson, *What constitutes 'best notice practicable' required by Rule
23(c)(2) of Federal Rules of Civil Procedure, in class actions brought under
Rule 23(b)(3)*, 32 A.L.R. Fed. 102 (1977) ..........................................................10

Plaintiffs Debbie Carthan, Bernadette Beekman, Julia A. Harris, Cassondra Joseph, Margo Kyler Knight, Jane Lefkowitz, Leslie Levitt-Raschella, Kelly Whitaker (formerly known as Kelly McGurn), Dennis Meduri, Giorgina Meduri, Greta Moss, Alexandria Rudolph, Jeanne Sacklow, Erika Targum, and Mark Wade (collectively, "Plaintiffs") respectfully submit this Supplemental Memorandum of Law in Further Support of Motions for Final Approval of Class Action Settlement (the "Motion for Final Approval") and Award of Attorneys' Fees, Reimbursement of Expenses, and Service Awards (the "Fee Motion").

## I.   INTRODUCTION

On January 11, 2022, the parties, through counsel, appeared before this Court for the Final Approval Hearing on the proposed Settlement in this case (the "January 11 Final Approval Hearing").[1]  The parties responded to questions by the Court and the Court continued the Hearing to March 1, 2022, in order to allow the parties to submit additional information for the Court's consideration.  *See* Minute Entry, Jan. 11, 2022; Jan. 11, 2022 Final Hearing Transcript ("FH Tr.") attached as Exhibit A to the Declaration of Timothy J. Peter ("Peter Decl.").  The parties greatly appreciate the time the Court has expended, and this Supplement seeks to address the Court's questions, along with the Declaration of Nicholas Cavallaro ("Cavallaro Decl."), attached as Exhibit B to the Peter Decl., and the Fourth Supplemental Declaration of Richard W. Simmons of Analytics Consulting LLC (the "Fourth Simmons Decl.")—who plans to attend and participate in the continued hearing on March 1, 2022.  Plaintiffs respectfully submit that, when read in conjunction with all previously submitted documents, these materials demonstrate that the Settlement is fair, reasonable and adequate, including the request for attorneys' fees, expenses and

---

[1] All capitalized terms used and not otherwise defined herein have the definitions set forth in the Settlement Agreement.  *See* ECF No. 177-1.  References to "¶ _" are to sections in the Settlement Agreement.

Service Awards, and warrants approval by the Court. Importantly, there were no objections or opt-outs, further reinforcing the fairness of the Settlement, attorneys' fees, expenses and Service Awards.

The proposed Settlement Agreement between Plaintiffs and Hudson's Bay Company ULC ("HBC") (formerly known as Hudson's Bay Company), Saks Incorporated, Saks Fifth Avenue LLC, Saks & Company LLC, and Lord & Taylor LLC (collectively, "Defendants") provides the outstanding result of: (1) providing substantial monetary benefits to the Settlement Class; and (2) requiring Defendants to make costly and wide ranging changes to their data security practices that will benefit the Settlement Class and the public.[2]  Not including the injunctive relief portion, the Settlement has a total value of $3,665,000.

For the efforts of Plaintiffs' Counsel and Plaintiffs as putative Class Representatives, the Settlement Agreement permits Plaintiffs' Counsel to seek an award of reasonable attorneys' fees and expenses up to $1,400,000, as well as seek a Service Award payment to each of the Plaintiffs in the amount of one thousand dollars ($1,000) per person, all of which is to be paid separately by Defendant HBC and not out of the monetary relief afforded to the Settlement Class (described in the Motion for Final Approval).  *See* ¶¶ 8.1, 8.2, 8.4.  In light of the extensive work performed by Plaintiffs' Counsel and the successful result obtained, Class Counsel requests an award of $1,346,799.40 for attorneys' fees as well as $53,200.60 for Plaintiffs' Counsel's reasonable out-of-pocket expenses incurred in successfully prosecuting this action, as detailed herein and to be paid by Defendants.  Plaintiffs also seek Service Awards of $1,000 each (totaling $15,000) for

---

[2] For a detailed account of the factual and procedural background of this case, and the terms of the Settlement Agreement, Class Counsel refer the Court to the Motion for Final Approval, and the Joint Declaration of Janine L. Pollack and Timothy Peter ("Joint Decl."), ECF No. 187.

.

their time and effort expended in assisting the prosecution of the Litigation, as well as for bringing their claims and acting as Plaintiffs on behalf of the Settlement Class Members.

At the January 11 Final Approval Hearing, the Court raised certain issues with the parties, including: (1) whether the Notice Program was the best practicable pursuant to Fed. R. Civ. P. 23; and (2) whether the total value of the Settlement should be based on the benefits made available to the Class. Those issues are addressed herein. As demonstrated below, Plaintiffs respectfully submit that the Notice Program was indeed the best practicable. Moreover, under Supreme Court and Second Circuit authority followed by courts within this District, including this Court, the value of the Settlement should be based on the benefits made available to the Class.

## II.   THE CLAIMS PROCESS IS COMPLETE AND THE RESPONSE OF THE CLASS WAS CONSISTENT WITH OTHER CASES INVOLVING DATA BREACHES

As of February 18, 2022, the Settlement Administrator has received 5,198 claims that are either valid, or currently deficient but the Settlement Administrator is working on validating. *See* Fourth Simmons Decl., ¶¶ 17, 22. Of these 5,198 claims, there are 3,523 valid claims, and 1,319 and 356 deficient Tier 1 and 2 claims, respectively, which the Settlement Administrator is still working with the Class Members to perfect. *Id.* Further, while the Claims Deadline was originally January 31, 2022, Defendants have agreed to accept claims past the deadline. Peter Decl., ¶¶ 8-9. As explained below, this results in an estimated claims rate of 0.45-0.67%, which, combined with the fact that not a single Settlement Class Member has chosen to opt-out from or object to the Settlement, is an excellent result which compares favorably to other consumer data breach settlements.

While the precise number of Settlement Class Members is not known, Class Counsel submit that the closest estimate involves an analysis of the number of cards believed to have been affected and the number of cards typically held by consumers. Specifically, given that there were

an estimated three million affected cards (*see* Joint Decl., ¶ 12), and given that consumers have an average of 3.84 cards according to Experian,[3] it is reasonable to estimate that there are approximately 781,250 Settlement Class Members.[4]  With a total of 3,523 valid claims, and a combined 1,675 Tier 1 and 2 claims which the Settlement Administrator is working on validating, the estimated claims rate of the Settlement is between 0.45-0.67%.

This claims rate must be viewed in the context of the nature of data breach class action settlements. Specifically, not everyone who made a purchase using their credit card during the Exposure Window spent time addressing the Security Incident, which is a prerequisite to being a Settlement Class Member and submitting a valid claim form. This is not akin to a typical (i.e., non-data breach) consumer class action settlement, where any purchaser of a product within a certain period of time can submit a valid claim form. Indeed, while the Settlement Administrator has received 5,198 claims to date, "the settlement website has been visited by 68,763 users." Fourth Simmons Decl., ¶ 14. This demonstrates that while many consumers felt that they may be a Settlement Class Member, they chose not to fill out the form, meaning they likely believed they did not qualify.

Comparing this claims rate to other consumer data breach class actions demonstrates that the results achieved by this Settlement were a success.  For example, in *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1047, 1067, n.2, 18, the court

---

[3] *See* Stefan Lembo Stolba, *What Is the Average Number of Credit Cards per US Consumer?* https://www.experian.com/blogs/ask-experian/average-number-of-credit-cards-a-person-has/ (last visited February 18, 2022).

[4] The Court requested a calculation of the number of cards submitted with Settlement Class Members' claim forms.  *See* FH Tr. 14:4-21, 18:5-16.  Given that the Claim Form only requires Settlement Class Members to provide one card for their proof-of-purchase and given that Settlement Class Members cannot get recovery for multiple cards for the Tier 1 settlement, it was not feasible to determine the actual number of Settlement Class Members or cards used.

granted final approval of the settlement when there were approximately 130,000,000 eligible class members, but there were "as few as 11" class members who have filed valid claims, resulting in a claims rate of approximately ***0.0002%***. The claims rate in this Settlement also meets or exceeds those in the following data breach consumer settlements which were granted final approval: *Gordon v. Chipotle Mexican Grill*, No. 1:17-cv-01415 (D. Colo.), ECF 103 at 1 & ECF 102-3 at 2, n.1 (claims rate of less than 0.1%); *Target Corp. Customer Data Sec. Breach Litig.*, MDL No. 14-2522 (D. Minn.), ECF 615 at ¶¶ 4, 14 (claims rate of approximately 0.2%); *In re: The Home Depot Inc. Customer Data Sec. Breach Litig.*, No. 1:14-md-02583 (N.D. Ga.), ECF 181-1 at 25 & ECF 245-1 at ¶ 3 (claims rate of approximately 0.3%); *Corona v. Sony Pictures Entm't,* No. 2:14-cv-9600 (C.D. Cal.), ECF 145-1 at 11, n.8 & ECF 164 at 2 (claims rate of approximately 0.7%); *see also In re: LinkedIn User Privacy Litig.,* No. 12-cv-03088-EJD (N.D. Cal.), ECF 122 at 2 & ECF 145-2 at ¶ 12 (claims rate of approximately 0.7%).

Finally, as requested by the Court during the January 11 Final Approval Hearing, to the extent available from the documentation submitted, the Fourth Simmons Decl. provides such information as follows.

Of the 5,198 claims received by the Settlement Administrator, 4,833 of these claims are categorized as Tier 1 (for Settlement Class Members without documented out-of-pocket losses), and 512 are categorized as Tier 2 (for Settlement Class Members with documented out-of-pocket losses). *See* Fourth Simmons Decl., ¶¶ 17, 22. For the claims that are already validated, in the Tier 1 category, the claims are split amongst the Saks Fifth Avenue, Saks OFF 5TH, and Lord & Taylor stores, respectively, as follows: 1,636; 1,768; and 897. *Id.* ¶ 18.  For the claims that are already validated, in the Tier 2 category, the claims are split amongst the Saks Fifth Avenue, Saks OFF

5TH, and Lord & Taylor stores, respectively, as follows: 14; 12; and 3.[5] *Id.* As to the type of documentation submitted with the claim forms for those claims that are already validated, Tier 1 Settlement Class Members submitted 81 receipts, 88 payment card statements, and 3,345 did not submit any documentation. *Id.* ¶ 19.  Of those claims that are already validated, Tier 2 Settlement Class Members submitted 11 receipts and 16 payment card statements. *Id.*  Finally, because the Tier I Claim Form submitted without documentation requested the last four digits of the payment card used, not the type or number of credit cards, it is impossible to tell the exact number of cards used, or the types of credit cards used, which is embedded in the first four digits of the credit card. *Id.* ¶ 20. Given that there are only 16 of the currently validated Tier 2 claims which provided payment card statements, there are a negligible number of available type or number of credit cards used in this category. *Id.* ¶ 19.

For these reasons, the Settlement was a success, equaling or surpassing similar settlements in other consumer data breach settlements.

## III.   THE NOTICE WAS THE BEST PRACTICABLE UNDER THE CIRCUMSTANCES AND SATISFIED DUE PROCESS UNDER RULE 23

Before final approval can be granted, due process and Rule 23 require that the notice provided to the Settlement Class is "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974).  "Such notice to class members need only be reasonably calculated under the circumstances to apprise interested parties of the pendency of the settlement proposed and to afford them an opportunity to present their objections." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, No. 04 Civ. 8144(CM),

---

[5] Claimants reported shopping at multiple stores, so the number of stores is greater than the number of already validated claims. *See* Fourth Simmons Decl., ¶ 18.

2009 WL 5178546, at *12 (S.D.N.Y. Dec. 23, 2009).  Notice must clearly state essential information regarding the settlement, including the nature of the action, terms of the settlement, and class members' options.  *See* Fed. R. Civ. P. 23(c)(2)(B).  At its core, all that notice must do is "fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceedings."  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 114 (2d Cir. 2005) (citation omitted).

At preliminary approval, the Court approved the proposed Notice, finding it met the requirements of Rule 23 and due process.  *See* Order Certifying A Settlement Class (ECF No. 180) at 8.  The Settlement Administrator executed the Notice Plan as approved by the Court.  *See* Supplemental Declaration of Richard W. Simmons ("Supp. Simmons Decl."), ECF No. 189. Moreover, as described further below, the parties ultimately implemented further notice activities, going well beyond the Notice Plan approved by the Court, to ensure the best possible reach to Settlement Class Members.

Given the broad reach of the Notice, and the comprehensive information provided to the Settlement Class, the requirements of due process and Rule 23 are met.  *See In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.*, 271 F. App'x 41, 44 (2d Cir. 2008) ("It is clear that for due process to be satisfied, not every class member need receive actual notice, as long as class counsel 'acted reasonably in selecting means likely to inform persons affected.'") (quoting *Weigner v. City of N.Y.*, 852 F.2d 646, 649 (2d Cir. 1988)).

During the January 11 Final Approval Hearing, the Court inquired whether Notice of the Settlement was required to have been placed on the www.saksfifthavenue.com and www.saks.com websites ("Saks Websites") to constitute best practicable notice.  *See* FH Tr., pp. 12-14, 17.  As other courts in similar circumstances have determined, it does not.  For example, in *Mirakay*, an

objector argued that the settlement was "unfair and unreasonable" because it did not "provide best notice to all persons who may have purchased [the product]" given that "the notice should have been posted on, [*inter alia*], Defendant's website." *Mirakay v. Dakota Growers Pasta Co.*, No. 13-cv-4429 (JAP), 2014 WL 5358987, at *3 (D.N.J. Oct. 20, 2014). The court rejected this argument, holding that the "widespread and comprehensive" court-approved notice program provided "sufficient notice," and that the reception to the settlement was positive given the "small number of negative responses" and the fact that "only twelve (12) objections to the settlement had been filed." *Id.* at *7, 11. And in *Kaufman v. Am. Exp. Travel Related Servs., Inc.*, 283 F.R.D. 404 (N.D. Ill. 2012), the court rejected the notion that "corporate defendants [should] post a link to a settlement web site on their home page," requiring only that the notice "reach a meaningful portion of class members." *Kaufman*, 283 F.R.D. 404, 408.

Here, distribution of the Notice also reached a "meaningful portion" of class members. *Id.* As demonstrated in the Supp. Simmons Decl., the Notice Program served ***over 22,000,000*** impressions, which is over 70% of the certified Settlement Class. *See* Supp. Simmons Decl., ¶ 13. The Federal Judicial Center notes that a notice plan is reasonable if it reaches at least 70% of the class. FED. JUDICIAL CTR., "Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide 3", (2010). The Notice Plan here met these standards, as it had an estimated reach of at least 70%. *See* Supp. Simmons Decl., ¶ 15. Further, the reception to the Settlement was even stronger than *Mirakay*, as here, there have been *zero* requests to opt-out or object to the Settlement.

Other courts have reached the same conclusion as *Mirakay*, finding that requiring the defendant to post notice of the settlement on its website, or in-stores, is unnecessary. For example, in *Kukorinis v. Walmart, Inc.*, No. 1:19-cv-20592-JEM (S.D. Fla. 2021), the court overruled an objector who argued that, as part of the settlement, the defendant "should have, among other things,

posted signage within its stores regarding notice of the proposed Settlement Agreement." *Kukorinis*, ECF No. 97 at 10 (attached as Exhibit E to the Peter Decl.). The court held that such a requirement would "be unduly burdensome to a Defendant that denies all liability," and noted that the objector failed to provide any "indication that this form of notice would fare any better than the already-implemented notice program in this case" given that the reach of the notice program was a success. *Id.*

Here, placing the notice on the www.saksfifthavenue.com and www.saks.com websites would be more than burdensome, but *impossible*, given that, since the time preliminary approval was granted, "none of the Defendants in this case […] had authority to direct that a notice be provided on the Saks.com Websites." Cavallaro Decl., ¶¶ 15-16, 20. The same applies to the Lord & Taylor website following the August 2019 sale of Lord & Taylor assets, "including the name and the right to operate an ecommerce website" to a "third party with whom HBC has no relationship." *Id.* ¶ 13. Further, as of June 2021, "ownership and operation of the Saks OFF 5TH Website was split into a different company." *Id.* ¶ 19.; *see also* Declaration of Gregory T. Parks, ¶¶ 12-19 (attached as Exhibit D to the Peter Decl.) For these reasons, Defendants did not have the authority or capability to direct notice on either the Saks, Saks OFF 5TH, or Lord & Taylor websites since the time preliminary approval was granted in this case.

During the settlement negotiations, Plaintiffs in fact requested that Defendants issue direct notice to Settlement Class Members to the extent possible. *See* Peter Decl., ¶ 4. Defendants responded that they did not have the capability of identifying Settlement Class Members. *Id.* Thus, as a condition of settlement, Plaintiffs required Defendants to submit written confirmation under oath that they had no ability to identify or contact Settlement Class Members. *Id.* at ¶ 5; *see also* ¶ 4.8. Defendants did provide such written confirmation via Defendants' July 7, 2021 declaration

that "Hudson's Bay's own internal systems do not allow Hudson's Bay to independently identify the Settlement Class or the postal or email addresses of the individuals in the Settlement Class." Declaration of Frank Price, ¶ 4 (attached as Exhibit C to Peter Decl.).  Further, as to the Lord & Taylor cardholders, Defendants could not have provided direct notice to such Settlement Class Members[6] given that after November of 2019, HBC had no "right to demand personal information about Lord & Taylor credit card holders from Capital One for their own purposes." Cavallaro Decl., ¶¶ 5, 9.

Regardless, as recognized by many courts "in certain types of cases such as […] many consumer actions" where "neither plaintiffs nor defendants will have the ability to identify the majority (or sometimes any) of the class members," "publication notice placed in appropriate periodicals and on internet sites satisfies due process." Joseph M. McLaughlin, § 5:81 Rule 23(b)(3)—"Best notice practicable under the circumstances"—Methods of providing notice, 1 McLaughlin on Class Actions § 5:81(18th ed.); *Brown v. 22nd Dist. Agricultural Ass'n*, No. 15-cv-2578-DHB, 2017 WL 2172239, *4 (S.D. Cal. 2017) ("Notice by publication is used when the identity and location of class members cannot be determined through reasonable efforts."); *Weeks v. Kellogg Co.*, No. CV 09-08102(MMM)(RZx), 2013 WL 6531177, *4 (C.D. Cal. 2013) (accepting publication notice when the defendant "does not have the mailing addresses of all persons who purchased the cereals during the class period"); *see also* Marcia G. Robeson, *What constitutes 'best notice practicable' required by Rule 23(c)(2) of Federal Rules of Civil Procedure, in class actions brought under Rule 23(b)(3)*, 32 A.L.R. Fed. 102 (1977) ("Many courts have

---

[6] As discussed during the January 11 Final Approval Hearing, Saks Fifth Avenue cards were not compromised by the incident given that these cards "are [] 14 digits" and the malware was designed to "pick up numbers that were 16 digits."  FH Tr. 3:6-4:3. As such, Saks cardholders are not included in the Settlement.

allowed publication notice alone, often in newspapers, where the class members were not "identifiable," that is, where members could not be identified by name and address without an unreasonable amount of effort, or could not be identified at all, as in taxpayer or consumer class actions."). Publication-only notice has also been approved in consumer class action settlements administered by the Settlement Administrator in at least the following actions: *Evans v. Linden Research, Inc.*, No. 4:11-cv-01078, ECF No. 136 at 4; *In re: Certainteed Fiber Cement Siding Litig.*, MDL 2270, ECF Nos. 87-5, 119 at 3; *Kobylanski v. Motorola Mobility*, No. 2:13-cv-01181 (W.D. Pa.), ECF No. 43 at 1-2; *Plubell, v. Merck and Co.*, No. 04CV235817-01; *Skold v. Intel Corp.*, No. 1-05-cv-039231 (Super. Ct. of Santa Clara, CA); *Geanacopoulos v. Philip Morris USA, Inc.* Civil Action No. 98-6002-BLS1 (Super. Ct. of the Commonwealth of Mass.). Fourth Simmons Decl., ¶ 13.

In addition, requiring the Notice to be placed on the Saks Websites would not lead to the best notice practicable under the circumstances given that "the incident itself affected cards used at stores.  It did not affect cards used on the websites." FH Tr., 13:3-8; *see* Second Am. Compl., ECF No. 75, ¶ 4 (explaining that the hack targeted "the retailers' point of sale [POS] systems," which are physical terminals located in-store, not on the Saks Websites); *see also Tesauro v. Quigley Corp.*, 59 Pa. D. & C.4th 35, at *2-3 (Com. Pl. 2002) (citing various district courts and holding that "publishing notice on defendant's website" is not required, particularly when "there is no concrete evidence that any potential member of the Class bought [the product] through the defendant's website.").

Notably, the Notice Plan also included the issuance of a press release detailing the Settlement issued via PR Newswire's US1 Distribution list.  A total of at least 122 news outlets picked up the notice of the Settlement from that press release, for a potential audience of

approximately 132,000,000 individuals.  *See* Supp. Simmons Decl., ¶ 10.

Finally, to ensure that the Notice was disseminated to a significant number of Class Members, the Settlement Administrator took additional steps to supplement the Court-approved Notice Plan that are not commonly conducted for consumer class actions.  These efforts were made in addition to the Settlement Administrator's targeting of consumers who shopped at Defendants' retail locations via the use of 22,000,000 state-of-the-art banner advertisements and the press release.  Not only was the website HBCSettlement.com created when the Notice program began, but subsequently, Analytics caused the settlement website to appear at the following: SaksSettlement.com.,                LordandTaylorSettlement.com,                and SaksandLordandTaylorSettlement.com."    Fourth Simmons Decl., ¶ 12.    These additional webpages "were submitted to Google and Bing (the top two search engines) for inclusion in their search results."  *Id.*  Further, "Analytics caused the notice to be disseminated by TopClassActions.com, a media company dedicated to distributing information (via social media, websites, and email) regarding class action settlements."  *Id.* TopClassActions.com has a monthly reach of over 6,000,000 customers and its weekly newsletter has more than 800,000 subscribers. *See* Third Supplemental Declaration of Richard W. Simmons, ECF No. 223, ¶ 6.  Finally, "Analytics followed up via email with every class member who began a claim but did not submit their claim either online or by mail."  Fourth Simmons Decl., ¶ 15.

In addition, while not part of the Notice Plan, Class Counsel posted news about the Settlement and a link to the settlement website on their firm websites, as did some of the other of Plaintiffs' Counsel.  *See* Peter Decl., ¶ 7.

Given the broad reach of the Notice, and the comprehensive information provided to the Settlement Class, the requirements of due process and Rule 23 were met.  *See In re Adelphia*

*Commc'ns Corp. Sec. & Derivative Litig.*, 271 F. App'x at 44. By all accounts, the notice program approved by the Court as part of the Preliminary Approval Order (ECF No. 180 at 8) has been fully implemented and successful, and warrants approval by the Court, affirming its prior decision.

## IV. UNDER SUPREME COURT AND SECOND CIRCUIT AUTHORITY, THE VALUE OF THE SETTLEMENT SHOULD BE BASED ON THE BENEFITS MADE AVAILABLE TO THE CLASS

The Supreme Court, and the courts of this Circuit, have consistently recognized that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). *See also Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 47 (2d Cir. 2000) ("The rationale for the [common fund] doctrine is an equitable one: it prevents unjust enrichment of those benefitting from a lawsuit without contributing to its cost."). Payment of fees from funds made available in a class action settlement is also supported by public policy, as "[c]ompensating plaintiffs' counsel for their risks is crucial, because such actions could not be sustained if plaintiffs' counsel were not to receive remuneration from the settlement fund for their efforts on behalf of the class." *In re Signet Jewelers Ltd. Sec. Litig.*, No. 1:16-cv-06728-CM-SDA, 2020 WL 4196468, at *45 (S.D.N.Y. July 21, 2020) (internal quotation marks and brackets omitted).

Although the Settlement Agreement does not create a traditional "common fund," the total maximum amount to be paid by Defendants upon approval by the Court is $3,665,000. This includes: (1) the $2,000,000 maximum amount to be paid for all Settlement Class Member claims, *see* ¶ 2.2.5; (2) the costs of notice and administration up to $250,000, *see id.* ¶ 2.4;[7] (3) the

---

[7] In the event the costs of Settlement Administration exceed $250,000, the excess costs will be borne by Plaintiffs' Counsel. *See* ¶ 2.4.

$1,400,000 requested for attorneys' fees and reasonable expenses; *see id.* ¶ 8.2; and (4) the $15,000 in total requested Service Awards for the Plaintiffs.  *See id.* ¶ 8.4.

In calculating the $3,665,000 settlement value, under Supreme Court and Second Circuit precedent, the entire $2,000,000 made available for Settlement Class Member claims should be considered, regardless of how much of it is claimed by Settlement Class Members.  *See Boeing*, 444 U.S. at 480–81 (holding that attorneys for a successful class may recover fee based on entire fund created for class, even if some class members make no claims against fund so that money remains in fund that otherwise would be returned to defendant); *see also Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007) (holding the "entire Fund, and not some portion thereof, is created through the efforts of counsel at the instigation of the entire class" and therefore fees should be allocated based on "total funds made available, *whether claimed or not*") (emphasis added); *Torres v. Gristede's Operating Corp.*, 519 F. Appx. 1, 5 (2d Cir. 2013) (settlement value must be "[c]alculated 'on the basis of the total funds made available,'" … "i.e., as if it were a common settlement fund – the $3.86 million total award of costs and fees here represents 52.2% of the entire $7.39 million recovered by plaintiffs.") (quoting *Masters*, 473 F.3d at 437); *Park v. FDM Grp., Inc.*, No. 16-CV-1520 (LTS)(SN), 2021 WL 227339, at *1 (S.D.N.Y. Jan. 22, 2021) (same) (citing *Masters*, 473 F.3d at 437).[8]

---

[8] The court in *Park*, 2021 WL 227339, at *1, also cited, *inter alia*, *In re Nassau Cnty. Strip Search Cases*, 12 F. Supp. 3d 485, 492-93 (E.D.N.Y. 2014) ("noting 'that the percentage is applied to the total amount recovered on behalf of the class (i.e. the 'common fund'), not to the lesser sum that in all probability will be claimed by members of the class from that fund'"); and *In re Nigeria Charter Flights Litig.*, No. 04-CV-304, 2011 WL 7945548, at *5 (E.D.N.Y. Aug. 25, 2011) ("holding that controlling Second Circuit precedent set forth in *Masters* requires the percentage of the common fund be based on the entire fund not the value of claims made"), *report and recommendation adopted*, No. 04-CV-304, 2021 WL 1886352 (E.D.N.Y. May 23, 2012).

Importantly, courts have also expressly held that the same reasoning applies in a "claims-made" settlement such as this one. *See Zink v. First Niagara Bank, N.A.*, No. 13-CV-01076-JJM, 2016 WL 7473278, at *8-9 (W.D.N.Y. Dec. 29, 2016) (in "claims-made" settlement, fees must be based on percentage of total amount of monies made available to class, even if not claimed); *Behzadi v. Int'l Creative Mgmt. Partners, LLC*, No. 14-cv-4382 (LGS), 2015 WL 4210906, at *2 (S.D.N.Y. July 9, 2015) ("This is a claims made settlement, meaning the amount paid to the class will depend on the number of claims submitted by class members. Nevertheless, awarding attorneys' fees based on a percentage of the settlement amount rather than the amount paid is proper.") (citing *Masters*, 473 F.3d at 437). Notably, in *Boeing*, 444 U.S. at 482, which involved a judgment, the defendant had a "latent claim" to whatever monies were not claimed by class members from the judgment fund and the Supreme Court nonetheless held that the class' "right to share the harvest of the suit upon proof of their identity, *whether or not they exercise it*, is a benefit in the fund created by the efforts of class representatives and their counsel." *Id.* at 480 (emphasis added). As such, the Supreme Court held that the class counsel fees were properly based on the entire fund as opposed to the portion for which claims were approved. *See id.* at 477-78.

Similar to the foregoing cases, this Court recently faced the identical circumstances in the sister case to this one against the very same Defendants brought by the financial institutions who lost money as a result of the same Security Breach at issue here. *See Ark. Fed. Credit Union v. Hudson's Bay Co.*, No. 1:19-cv-4492 (PKC) (the "Financial Institution Action"). That case was filed approximately one year after the instant action, was mediated after the instant action (by the same mediator – the Honorable Diane Welsh) and did not settle until after the instant action. Nonetheless, the final approval hearing on that settlement occurred on December 7, 2021, a month before the January 11 Final Approval Hearing in this case. The structure of that settlement was

nearly identical to the instant action:  a claims-made settlement ($4 million made available to the settlement class), where Defendants paid the attorneys' fees, expenses, administration costs and service awards separately (a total of $1.1 million made available).[9]

In their motion requesting fees, the Financial Institution Plaintiffs (correctly) argued that under Second Circuit authority, the value of their claims-made settlement for the purpose of determining attorneys' fees should be the total amount made available to the class through the efforts of class counsel regardless of how much was actually claimed by class members.  *See id.* ECF No. 99, at 5-6 (citing, *inter alia*, *Masters*, 473 F.3d at 437).  They (correctly) claimed that this value was $5.1 million, which was comprised of the $4 million made available to the class and the $1.1 million in attorneys' fees, expenses, administration and service awards.  *Id.* at 6.  At the final approval hearing, class counsel noted that approximately 5% of the class had submitted a claim to date with some 10 weeks left in the claims period (which ran through February 17, 2022). *See* Financial Institution Dec. 7, 2021 Transcript ("Financial Institution Tr.") at 2-3 (attached as Exhibit F to the Peter Decl.)  Based on this information (*i.e.*, not the final number of claims made at the end of the claims period) and pursuant to the authority submitted, this Court approved the claims-made settlement, the entire requested fees, expenses and service awards.  *See id.* at 19-20.[10]

---

[9] *See* Financial Institution Action Settlement Agreement, ECF No. 86-1 at Section 4.4.a.i. ("Payments to the Settlement Class shall be administered on a "claims made" basis in accordance with the Claims Administration and Distribution Plan…. This means that Hudson's Bay will provide sufficient funds to pay only those Approved Claims submitted by Settlement Class Members in accordance with the Claims Administration and Distribution Plan. Hudson's Bay will not be required to establish a settlement fund."); Section 4.4.b.ii. ("Hudson's Bay will pay Court-approved Class Counsel attorneys' fees, expenses, and notice and administration costs in an amount not to exceed $1,100,000, inclusive of the Service Awards"); Section 4.4.b.i. ($3,000 service award for each of the two class representatives: Vice President of Accounting at Arkansas Federal Credit Union; and the Vice President of Finance and Risk Management, and the Director of Compliance and Risk Management at The Summit Federal Credit Union).

[10] As did Class Counsel in this case, the Financial Institution Plaintiffs also argued that the value

Class Counsel believe that in doing so, this Court acknowledged and correctly held that the value of the settlement was the total made available to the settlement class. *See id.* at 14 (noting that the fee requested was a percentage "of the total *maximum* recovery of the class" – *i.e.*, $5.1 million, which included the $4 million made available to the class and the $1.1 million for attorneys' fees, expenses, administration and service awards) (emphasis added).   Class Counsel respectfully submit that this parallel sister settlement to the instant matter, previously approved by the Court in December 2021, thus provides recent precedent for the request here that the value of the settlement be based upon the entire amount made available to the Settlement Class.

*Zink*, 2016 WL 7473278, at *8-9, reinforces this position and is consistent with this Court's ruling in the Financial Institution settlement.   In *Zink*, the court acknowledged that the law in the Second Circuit is clear that the value of the settlement for purposes of awarding attorneys' fees is based on "'the total funds made available, whether claimed or not.'"   *Id.* at *7 (quoting *Masters*, 473 F.3d at 437).   The court went on to analyze whether there would be any reason to treat a claims-made settlement any differently and concluded there would not because the court "[did] not believe that the *Masters* holding is limited to situations in which the unclaimed funds do not revert to the defendant."   *Id.* at *8. The court further noted that "in both of the cases with which *Masters* 'side[d],' the unclaimed funds *did* revert to the defendant."   *Id.* (emphasis in original) (citing *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1292 (11th Cir. 1999); *Williams v. MGM-Pathe Commc'n Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997).[11]   As such, the *Zink* court

---

of the settlement must include the attorneys' fees the defendant has agreed to pay.   *See* Financial Institution Action, ECF No. 99 at 6 (citing *Fleisher v. Phoenix Life Ins. Co.*, No. 11-CV-8405 (CM), 2015 WL 10847814, at *16 n.10 (S.D.N.Y. Sept. 9, 2015) (noting that the "proper benchmark for the monetary portion of the fund" included the agreed settlement amount and attorneys' fees)).

[11] The *Zink* court, 2016 WL 7473278, at *7 n.8, also cited, *inter alia*, *Alleyne v. Time Moving &*

concluded that the "weight of authority" holds that the value of a claims-made settlement is based on the amount made available to the class, whether claimed or not.[12]

As the Eleventh Circuit noted in *Waters*, "a leading commentator on class actions" has stated that as to the question of whether the total value of the settlement is the total amount made available when the defendant will recapture any unclaimed portion of the settlement, the Supreme Court, in the *Boeing* case, "settled this question by ruling that class counsel are entitled to a reasonable fee based on the funds potentially available to be claimed, regardless of the amount actually claimed." *Waters,* 190 F.3d at 1297 (quoting Herbert B. Newberg and Alba Conte, Newberg on Class Actions § 14.03, at 14-14 (3d ed. 1992)).[13]

As noted *supra*, this Court correctly took the same approach in the Financial Institution settlement a few months ago given that it accepted that the value of the settlement was $5.1 million (which included the whole $4 million fund made available to class members but not claimed in the claims process). As such, as in the Financial Institution settlement, *Boeing*, *Zink* and *Behzadi*, as well as the numerous other cases cited above, Class Counsel respectfully submit that the Court

---

*Storage Inc.*, 264 F.R.D. 41, 59 (E.D.N.Y. 2010) ("the value of legal service rendered in the creation of a settlement fund [is not] diminished by the failure of beneficiaries to cash in, regardless of what happens to the surplus"); and *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 285 (6th Cir. 2016) ("an option to file a claim creates a prospective value, even if the option is never exercised").

[12] The *Zink* court noted that "[s]ome courts have concluded that *Masters* is not applicable to a claims-made settlement." *See Zink*, 2016 WL 7473278, at *7 (citing *Bodon v. Domino's Pizza, LLC*, 2015 WL 3889577 (E.D.N.Y.), *adopted*, 2015 WL 3902405 (E.D.N.Y. 2015)). The *Zink* court's thorough analysis rejected that conclusion based on its analysis of controlling Second Circuit authority in *Masters*.

[13] *See also Poertner v. Gillette Co.*, 618 F. Appx. 624, 630 (11th Cir. 2015) (affirming fee award by district court, stating that objector's argument was erroneous that the value of the settlement should have been limited to the actual payments to the class in claims-made settlement and was instead properly based on the value of the total amount made available).

should value the Settlement here at $3,665,000, including all the component parts, regardless of the amount actually claimed by Settlement Class Members. *See Masters*, 473 F.3d at 437.[14]

Class Counsel's request of $1,346,799.40, or 36.7% of the $3,665,000 in total funds made available to the Settlement Class (before taking into account any of the $20 million in injunctive relief value),[15] is eminently reasonable as the amount of attorneys' fees awarded under the percentage methodology in this Circuit is often one-third of the settlement value or higher. *See, e.g., Torres*, 519 F. App'x at 5-6 (noting one-third of common fund is benchmark in Second Circuit and affirming higher percentage – 52.2% – of settlement value for attorneys' fees and expenses); *Rapoport-Hecht v. Seventh Generation, Inc.*, No. 14-CV-9087 (KMK), ECF No. 60 at 1-2 & 2017 WL 5508915, at *3 (S.D.N.Y. Apr. 28, 2017) (awarding 33.3% of $4.5 million settlement fund); *Raniere v. Citigroup Inc.*, 310 F.R.D. 211, 216, 220–22 (S.D.N.Y. 2015) (approving one-third of $4,650,000 settlement as fees); *Mayhew, et al. v. KAS Direct, LLC, et al.*, No. 7:16-cv-06981-VB, ECF Nos. 133 at 1-2 & 149 at 6 (S.D.N.Y. Nov. 30, 2018) (33.3% of $2,215,000 settlement fund); *In re Dental Supplies Antitrust Litig.*, No. 1:16-cv-00696-BMC-GRB, ECF Nos. 328 at 1 & 350 at 28 (E.D.N.Y. June 25, 2019) (awarding one-third of $80,000,000 settlement fund); *see also, e.g., Huyer v. Buckley*, 849 F.3d 395, 399 (8th Cir. 2017) (finding 38% of fund as reasonable).

The valuation of the Settlement in the amount of $3,665,000 does not take into account the $20 million value of the injunctive relief achieved by Plaintiffs. This relief consisted of extensive and costly security improvements Defendants agreed to make as part of the Settlement Agreement. *See* ¶ 2.5. These changes include: (1) hiring a qualified security assessor on an annual basis to

---

[14] As noted *supra*, the number of claims made in this Settlement was consistent with those in other data breach settlements.

[15] As provided in conjunction with Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement, "[t]he full value of this [injunctive] relief for the three-year period is in excess of $20 million." *See* ECF No. 187-1.

assess compliance with PCI Data Security Standard requirements and achieving a Report on Compliance that evidences compliance with all such requirements; (2) conducting annual PCI penetration testing of the cardholder environment in compliance with PCI DSS Section 11.3, and remediating all critical vulnerabilities where feasibly possible; (3) operating a system that is designed to encrypt or tokenize Payment Card information at the pin pad level of the point of sale terminals in stores or otherwise renders payment card information unreadable at the pin pad level using a method like encryption or tokenization that is approved under PCI standards; and (4) maintaining written information security programs, policies and procedures. *See* Joint Decl., ¶ 18, Ex. A. These changes will provide a great benefit to the Class and the public, and Defendants' counsel has informed Class Counsel that the cost of these changes over the next three years will be in excess of $20 million. *Id.* The value of this injunctive relief should be taken into account in considering the total settlement value and in evaluating the fee request. *See Torres*, 519 F. App'x at 5; *Fleisher v. Phx. Life Ins. Co.*, No. 11-cv-8405 (CM), 2015 WL 10847814, at *17 (S.D.N.Y. Sept. 9, 2015) ("The substantial injunctive relief is a major factor in favor of the fee request . . . ."); *In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 49 (E.D.N.Y. 2019) ("the value of . . . injunctive relief cannot be ignored in assessing the range of reasonableness of this settlement.").

Plaintiffs refer the Court to their Fee Motion for a full analysis of the support for the requested attorneys' fees and expenses under both the lodestar and percentage methods. Taking into account all of the benefits of the Settlement, Plaintiffs respectfully submit that an award here slightly in excess of one-third of the settlement value (*i.e.*, 36.7%) is fair and reasonable as the relation of the fee request to the value of the Settlement supports approval of the requested fee award. *See Torres*, 519 F. App'x at 5 (award of 52.2% of settlement value "does not constitute an

abuse of discretion simply because it deviates materially from the percentage usually awarded in similar cases") (internal quotation marks omitted). Given that there were no objections to the attorneys' fees or expenses (or the Settlement itself), *see, e.g., Guevoura Fund Ltd. V. Sillerman*, No. 1:15-cv-07192-CM, 2019 WL 6889901, at *22 (S.D.N.Y. Dec. 18, 2019), that the fees and expenses are being paid by Defendants separately from the monies made available to the class, and that the amount requested is a negative multiplier of 0.44 times Plaintiffs' Counsel's "lodestar,"[16] this further supports that the requested fees are fair and reasonable.[17]

## V.     CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court grant approval of $1,400,000 in fees and expenses ($1,346,799.40 for attorneys' fees as well as $53,200.60 for Plaintiffs' Counsel's reasonable out-of-pocket expenses), and a $1,000 Service Award to each of the Plaintiffs.

DATED:  February 18, 2022

*/s/ Timothy J. Peter*
Timothy J. Peter (admitted *pro hac vice*)

---

[16] *See Guevoura Fund Ltd.*, 2019 WL 6889901, at *18 ("Courts have repeatedly recognized that the reasonableness of the fee request under the percentage method is reinforced where, as here, the percentage fee would represent a *negative multiplier* of the lodestar.") (internal quotation marks omitted) (emphasis added).

[17] This Court approved a fee with a multiplier of 1.62 in the Financial Institution settlement.  *See* Financial Institution Tr. at 14.  Furthermore, because Plaintiffs' Counsel will be required to spend significant additional time on this litigation in connection with implementing and monitoring the settlement, the negative multiplier will be even greater because the award includes not only time spent prior to the award, but after, in enforcing the settlement.  *See Beckman*, 293 F.R.D. 467, 482 (S.D.N.Y. 2013).  The negative multiplier that Class Counsel seeks thus will grow greater over time as Plaintiffs' Counsel completes their outstanding tasks, including, among other things, if the Settlement is approved, continuing to work with the Settlement Administrator to assure that the Settlement is fully implemented.  *See* Joint Decl. ¶ 22.  In light of this fact, Class Counsel's request is "even more reasonable than it appears at first glance." *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 482 (S.D.N.Y. 2013).

**FARUQI & FARUQI, LLP**
1617 JFK Boulevard, Ste. 1550
Philadelphia, PA  19103
Tel: (215) 277-5770
Fax: (215) 277-5771
tpeter@faruqilaw.com

Janine L. Pollack
Michael Liskow
**CALCATERRA POLLACK
LLP**
1140 Avenue of the Americas, 9th
Floor
New York, NY 10036-5803
Tel: (212) 899-1761
Fax: (332) 206-2073
jpollack@calcaterrapollack.com
mliskow@calcaterrapollack.com

**Interim Co-Lead Counsel for
Plaintiffs and the Class**

**FARUQI & FARUQI, LLP**
Nina Varindani (NV-1090)
685 Third Avenue, 26th Fl.
New York, NY 10017
Tel: (212) 983-9330
Fax: (212) 983-9331
Email: nvarindani@faruqilaw.com

Charles J. Hecht
**Charles Hecht P.C.**
45 East 66th Street-Unit 5E
New York, New York 10065
Tel: (917) 533-4442
cjhecht1@aol.com

Anthony Parkhill
**BARNOW AND ASSOCIATES,
P.C.**
One North LaSalle Street, Suite 4600
Chicago, IL 60602
Tel: (312) 621-2000
Fax: (312) 641-5504
a.parkhill@barnowlaw.com

Melissa R. Emert
**KANTROWITZ, GOLDHAMER
& GRAIFMAN, P.C.**
747 Chestnut Ridge Road, Suite 200
Chestnut Ridge, NY 10977
Tel: (866) 896-0935
memert@kgglaw.com

Charles E. Schaffer
**LEVIN SEDRAN & BERMAN,
LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
Fax: (215) 592-4663
cschaffer@lfsblaw.com

Jeffrey S. Goldenberg
**GOLDENBERG SCHNEIDER,
LPA**
One West Fourth Street, 18th Floor
Cincinnati, OH 45202
Tel: (513) 345-8297
Fax: (513) 345-8294
jgoldenberg@gs-legal.com

Gary Mason
**MASON LIETZ & KLINGER,
LLP**
5101 Wisconsin Avenue NW
Suite 305
Washington, DC 20016
Tel: (202) 640-1168
Fax: (202) 429-2294
gmason@masonllp.com

Laurence D. King
**KAPLAN FOX & KILSHEIMER
LLP**
850 Third Avenue
New York, New York 10022
Tel: (212) 687-1980
Fax: (212) 687 7714
lking@kaplanfox.com

23

John A. Yanchunis
Ryan Mcgee
**MORGAN & MORGAN
COMPLEX LITIGATION
GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel.: (813) 223-5505
Fax:  (813) 222-4736
jyanchunis@forthepeople.com
rmcgee@forthepeople.com

Jean Sutton Martin
**MORGAN & MORGAN
COMPLEX LITIGATION GROUP**
2018 Eastwood Road Suite 225
Wilmington, NC 28403
Tel: (813) 559-4908
Fax: (813) 222-4795
jeanmartin@forthepeople.com

Mark Rifkin
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
rifkin@whafh.com

Lynda J. Grant
**THE GRANT LAW FIRM**, **PLLC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Tel: (212) 292-4441
Fax: (212) 292-4442
lgrant@grantfirm.com

Ralph N. Sianni
**ANDERSON SLEATER SIANNI,
LLC**
2 Mill Road
Suite 202
Wilmington, DE 19806
Tel: (302) 510-8528
Fax: (302) 595-9321

rsianni@andersensleater.com

Kevin H. Sharp
**SANFORD HEISLER SHARP, LLP**
611 Commerce Street
Suite 3100
Nashville, TN 37203
Tel: (615) 434-7000
Fax: (615) 434-7020
ksharp@sanfordheisler.com

Aaron L. Brody
**STULL, STULL & BRODY**
6 East 45th Street
Fifth Floor
New York, New York 10017
abrody@ssbny.com

Jason P. Sultzer
**THE SULTZER LAW GROUP, P.C.**
85 Civic Center Plaza,
Suite 200
Poughkeepsie, NY 12601
Tel: (845) 244-5595
Fax: (888) 749-7747

**Counsel for Plaintiffs and the Class**