UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
IN RE HUDSON'S BAY COMPANY DATA           18-cv-8472 (PKC)
SECURITY INCIDENT CONSUMER
LITIGATION                                                OPINION
-----------------------------------------------------------x

CASTEL, District Judge:

         Plaintiffs have filed an unopposed motion for final approval of class action

settlement and separately move for an award of attorneys' fees and expenses.  (Docket # 183,

185.)  This Opinion sets forth the Court's reasons for granting final approval to the class action

settlement and granting a reduced award of attorneys' fees.  The Court will separately enter a

Final Approval Order and Judgment that conforms with the conclusions set forth herein.

         Plaintiffs bring numerous state law claims directed to a breach of payment-card

information belonging to customers who made purchases at the brick-and-mortar retail locations

of Lord & Taylor, Saks and Saks OFF 5TH stores between May 1, 2017 and April 1, 2018.

Defendants are Hudson's Bay Company ULC ("Hudson's Bay"), Saks Incorporated, Saks Fifth

Avenue LLC, Saks & Company LLC and Lord & Taylor LLC.  Plaintiffs assert that a syndicate

called "JokerStash" or "Fin7" accessed cardholder information, and then sold it on the so-called

dark web.  Plaintiffs assert that the breach caused them to spend time monitoring their accounts,

safeguarding account information, and, for some plaintiffs, resolving fraudulent charges and

withdrawals.  Subject matter jurisdiction is premised on the Class Action Fairness Act of 2005,

28 U.S.C. § 1332(d).

         The settlement provides for a $30 payment to any "Tier 1" claimant who submits

proof of a payment transaction during the period of the breach and confirms that he or she spent

some amount of time monitoring account information after the breach.  A "Tier 2" claimant will

be reimbursed for documented out-of-pocket expenses incurred as a result of the breach, such as costs and expenses related to identity theft or fraud, late fees, and unauthorized charges and withdrawals, in an amount not to exceed $5,000 per claimant.

Unlike a common fund settlement, this settlement is structured with aggregate caps in the amounts of a $2 million payment to class members, $1.4 million in attorneys' fees and expenses, $250,000 for the costs of claims administration, and $15,000 total for service awards to the individual plaintiffs.  As will be seen, the claims sought by class members are far below the aggregate cap of payments allocated to class members.

The deadline for class members to submit claims has passed, and the total amount to be paid to the class is $278,483.81 – less than 14% of the $2 million "Aggregate Cap." Plaintiffs' application for attorneys' fees nevertheless treats the settlement as something akin to a common fund with an overall value of $3,665,000, and seeks a percentage-based fees award of 36.7% from that amount, totaling $1,346,799.40.  There is, in fact, no common fund, as that term is commonly understood in class action litigation.  Plaintiffs do not seek a lodestar-based award and have not submitted billing records or other documentation that details the work of counsel on this case.

No class members have opted out of the class and no objections have been made to the settlement.  The Court conducted a fairness hearing on January 11, 2022, which was continued to March 1, 2022.  Among other things, the Court inquired about the adequacy of notice to the class, the details of the claims-submission process and the number of claims submitted by class members.  The fairness hearing confirmed, among other things, that the unclaimed portions of the "Aggregate Cap" were not and would never be paid by Hudson's Bay, explored the means used to provide notice to class members as compared to other alternatives,

and the manner in which claims could be submitted.  The Court reserved decision on final

approval and the fees application.

As will be explained, the Court concludes that the settlement is fair, reasonable

and adequate to the class.  The Court separately concludes that an attorneys' fees award in the

amount of $897,866.26 is reasonable, as is plaintiffs' request of $53,200.60 for the

reimbursement of out-of-pocket expenses.  Plaintiffs' application for service awards will be

denied in its entirety.

BACKGROUND.

A Second Consolidated Class Action Complaint consolidated the claims of

plaintiffs who originally commenced three separate consumer class actions directed to the

defendants' data breach.  (Docket # 137.)  Prior to the filing of the consolidated complaint, the

Court granted in part and denied in part a motion to dismiss the claims of one plaintiff.  See

Rudolph v. Hudson's Bay Co., 2019 WL 2023713 (S.D.N.Y. May 7, 2019).  That Opinion and

Order relied on the Second Circuit's non-precedential summary order in Whalen v. Michaels

Stores, Inc., 689 Fed. App'x 89 (2d Cir. 2017), and concluded that plaintiff had alleged an

injury-in-fact to the extent that she was damaged by the time and expense required to respond to

the breach but that her other proposed theories of loss failed to identify an injury-in-fact.  2019

WL 2023713, at *4-8.

Before consolidation, three putative consumer class actions brought claims

directed to the data breach: Beekman v. Lord & Taylor, LLC, 19 Civ. 4199 (PKC), which was

originally filed in the District of Delaware; Sacklow, et al. v. Saks Inc., 19 Civ. 4186 (PKC),

which was originally filed in the Middle District of Tennessee; and Rudolph v. Saks & Co. LLC,

18 Civ. 8472 (PKC), which was originally filed in the Central District of California.  (See

Pollack & Peter Dec. ¶¶ 5-7 (Docket # 187).)  The <u>Rudolph</u> action was transferred to this District following a joint stipulation of the parties, and the <u>Beekman</u> and <u>Sacklow</u> actions were transferred after defendants successfully moved pursuant to 28 U.S.C. § 1404(a).  (<u>See</u> <u>id.</u>)  The Court consolidated the three cases and administratively closed the <u>Beekman</u> and <u>Sacklow</u> cases. (Docket # 117.)

The Second Consolidated Amended Class Action Complaint brings common law claims of negligence, breach of implied contract, unjust enrichment and "breach of confidence," as well as statutory claims under consumer-protection and data-privacy laws of Arizona, California, Connecticut, Florida, Illinois, New Jersey, New York, Texas, Nevada and Georgia. (<u>See</u> Docket # 137.)  The parties reached an agreement in principle to settle this case after a motion to dismiss the Second Consolidated Amended Class Action Complaint was fully briefed but before it was decided.  (Docket # 156.)

Plaintiffs filed a motion for preliminary approval of the class action settlement on May 27, 2021.  (Docket # 175.)  The Court granted the motion for preliminary approval but modified the proposed procedures for objecting to the settlement.  (Docket # 180.)  As explained in an accompanying Opinion and Order:

> The proposed Orders of Preliminary Approval submitted by plaintiffs would have required objectors to submit detailed background information about themselves and their legal counsel, including information about fee arrangements, their historical participation in class action settlements and evidentiary summaries. The proposed requirements would have needlessly frustrated and discouraged objections to the settlement, with no countervailing benefits to the Court or the class.

<u>Arkansas Fed. Credit Union v. Hudson's Bay Co.</u>, 2021 WL 8445929, at *1 (S.D.N.Y. July 22, 2021).[1]

       The Court preliminarily approved the procedures for providing notice to the class, administering claims and allocating payment to class members.  The claims administrator described the notice program in the Declaration of Richard W. Simmons of Analytics Consulting LLC ("Analytics").  (Docket # 177-1 at 95-109.)  Simmons estimated that the class consisted of 3 million individuals, and that the key demographic profile of defendants' customers consisted of women ages 35 to 64 with college degrees and incomes above $75,000 who spent approximately 19 hours per week on the internet, among other characteristics.  (<u>Id.</u> ¶¶ 15-17.)  Using this demographic, the claims administrator purchased targeted digital banner advertisements intended to give notice to potential class members and directing them to a dedicated settlement website. (<u>Id.</u> ¶¶ 16, 19-22.)  Notice also was disseminated through a press release issued over PR Newswire.  (<u>Id.</u> ¶ 18.)  Through the settlement website, a potential class member could obtain information about the settlement and submit a claim form.  (<u>Id.</u> ¶¶ 27-29.)  The claims administrator also maintained a toll-free phone number and an email address for questions about the litigation and settlement.  (<u>Id.</u> ¶¶ 23-26, 30-31.)

       The claims deadline expired on January 31, 2022.  In a declaration of February 18, 2022, Simmons stated that the internet banner ads had reached 22,149,773 total viewer impressions.  (4th Simmons Dec. ¶ 11 (Docket # 229).)  The settlement website was accessed 68,763 times by 56,359 users.  (<u>Id.</u> ¶ 14.)  Analytics received 5,511 claims, consisting of 4,962 Tier 1 claims and 549 Tier 2 claims.  (<u>Id.</u> ¶ 17.)  Analytics deemed 3,514 Tier 1 claims to be valid, for a total claim value of $105,420.  (<u>Id.</u>)  It deemed 27 Tier 2 claims to be valid, for a total

---

[1] The order also modified similar provisions in a companion case brought on behalf of financial institutions affected by the breach, <u>Arkansas Federal Credit Union, et al., v. Hudson's Bay Company</u>, 19 Civ. 4492 (PKC).

value of $53,794.44.  (Id.)  Thus, as of February 18, 2022, the total amount to be paid to the class

was $159,214.44.  (Id.)  At that time, the claims administrator identified 1,319 deficient Tier 1

claims and 356 deficient Tier 2 claims, and Simmons explained that Analytics would continue to

work with the claimants to perfect their claims.  (Id. ¶ 22.)

At the fairness hearing, it became apparent that the number of accepted claim

submissions had been limited by a requirement that certain claimants mail a physical claim form

through the postal service, as opposed to simply submitting the form online.  (See 3/1/22 Tr. at 7-

12.)  A class member who had proof of a transaction, such as a receipt, could photograph the

receipt and upload it through the website, and therefore submit a completed claim electronically.

(Id. at 7.)  A class member without such proof could still submit a claim but would need to

generate a PDF, print the completed form and mail it to the claims administrator.  (Id. at 7-8.)

As explained by plaintiffs' counsel

> MR. PETER: We were concerned if you had to provide absolutely
> nothing that people may submit large numbers of fraudulent claims,
> but they still can do it, they just need to do it through the postal
> service.  And this form, it actually completely puts the form together
> for you, it creates the PDF, all you have to do is print and mail it off.
>
> THE COURT: So it was designed to dissuade people from filing a
> claim where they had no documentation?
>
> MR. PETER: It was to prevent people from doing electronic fraud.
>
> THE COURT: But the reason you wanted to prevent it is you felt
> that you would get too many bad claims if you allowed people to do
> this online?  That's what you just told me; right?
>
> MR. PETER:  I think that's correct, your Honor.

(Id. at 7-8.)  Counsel to defendants stated, "[I]t was our concern that really animated the need to

have the mail processed for forms or for claims that would be made without documentation

because it would be too easy for someone to just click a button and submit multiple claims.  It's a

lot harder to submit multiple claims by mail.  . . .  [I]f someone was going to try to gain [sic] the system and submit multiple claims, we wanted to make that harder."  (Id. at 10.)

        After the hearing of March 1, the parties entered into a Joint Stipulation that amended the Settlement Agreement in order to accept claims that had been completed electronically but had not been physically mailed to the claims administrator.  (Docket # 237-3.)  The stipulation provided in part that "[a]ny Settlement Class Member who did not physically or electronically sign or mail-in a Claim Form, but whose Claim Form was completed before the date of this amendment and otherwise meets all requirements for a valid claim under Sections 2.1.2 or 2.1.3 of the Settlement Agreement, shall have their Claim Form be accepted as valid and timely."  (Id.)

        In a declaration dated March 24, 2022, the claims administrator stated that, based on an agreement between the parties, Analytics had continued to accept claims that were perfected after the January 31 deadline.  (5th Simmons Dec. ¶ 5 (Docket # 238).)  He stated that 3,943 Tier 1 claimants had previously completed online forms but made no hard-copy mailing to Analytics.  (Id. ¶¶ 8, 19.)  Because those claims would now be accepted, the total number of Tier 1 claims had increased to 7,529.  (Id. ¶ 19.)  Thus, as of March 24, 2022, Analytics recalculated the value of all Tier 1 claims as $225,870.  (Id.)  The value of Tier 2 claims totaled $52,613.81, bringing the total dollar value of the settlement to $278,483.81.  (Id. ¶¶ 11, 19.)

        As noted, the Settlement Agreement provides for an "Aggregate Cap" to be funded by Hudson's Bay in an amount that "shall not exceed $2,000,000."  (Settlement Agrmt. ¶ 2.2.5.)  Based on the claims submitted by the class, $278,483.81 will be paid to the class members.  Thus, the "Aggregate Cap" of $2,000,000 is in no sense a common fund.  Only the $278,483.81 could be construed as a fund created by payments from Hudson's Bay.  The

difference between the cap and the amount paid by Hudson's Bay ($1,721,516.19) is and remains the sole property of Hudson's Bay.

The Settlement Agreement also provides for certain structural relief, which plaintiffs have characterized as "complex and costly security improvements" that will cost defendants more than $20 million to implement over three years.  (Pl. Fees Mem. at 16.)  These measures include annual data-security assessments performed by a qualified security assessor, improved encryption, and the drafting of written information-security policies.  (Settlement Agrmt. ¶ 2.5 (Docket # 177-1).)

Plaintiffs' proposed award of fees and expenses, and any service award to the individual plaintiffs, were separately agreed-upon figures negotiated by the parties.  Plaintiffs' counsel requests an attorneys' fees award of $1,346,799.40, plus $53,200.60 in expenses, for a total amount of $1,400,000.  (Docket # 185.)  Counsel characterizes this request as "36.7% of the funds made available by Defendants" as well as a negative lodestar multiplier of 0.44.  (Pl. Fees Mem. 20.)  Plaintiffs' counsel state that they have expended an aggregate total of 4,666.03 hours on this case, for a lodestar of $3,161,778.36.  (Pl. Fees. Mem. at 19.)  Attorneys from fourteen law firms have submitted declarations that describe their firms' work on behalf of the class.  (Docket # 190 to 203.)  None of the firms has submitted detailed billing records (number of hours spent by each billing attorney or paralegal for a given task or tasks, together with a description of the task or tasks) or similarly detailed descriptions of their work, and instead offer summary tables with the names and job titles of attorneys and staff members who worked on the case, the total number of hours billed, and that person's hourly rate.

The fairness hearing for final settlement approval began on January 11, 2022. (Docket # 224.)  When it became apparent that there were uncertainties about the number of

valid claim submissions and the total payment to the class, the hearing was continued to March

1, 2022.  (Docket # 234.)  The Court reserved decision on plaintiffs' motions for final approval

and attorneys' fees.

PLAINTIFFS' MOTION FOR FINAL SETTLEMENT APPROVAL WILL BE GRANTED.

I.      <u>The Settlement Class Will Be Certified.</u>

For a class to be certified, it must satisfy the requirements of Rule 23(a), Fed. R.

Civ. P., which considers numerosity, commonality of questions of law and fact, whether the

claims of the named plaintiffs are typical of the class and whether the representative parties

adequately represent the class's interest.

The settlement class consists of "all persons who used their credit, debit or

prepaid debit card (other than a Saks First branded credit card) at a Saks, Saks OFF 5TH, or Lord

& Taylor store in the United States and in U.S. territories from May 1, 2017 to April 1, 2018."

(Settlement Agrm't ¶ 1.6 (Docket # 177-1).)  The class definition excludes certain persons

affiliated with the defendants, their parents or subsidiaries, as well as certain persons affiliated

with the Court, including chambers staff and family members.  (<u>Id.</u>)

The settlement class satisfies the threshold requirements of Rule 23(a).

On numerosity, plaintiffs have stated that discovery indicated that "the lowest

possible number of affected payment cards is likely three million."  (Pollack & Peter Dec. ¶ 12

(Docket # 187).)  The Court finds that the class is so numerous that joinder of all members is

impracticable.  <u>See</u> Rule 23(a)(1).

The proposed class satisfies the requirement that its members have common

questions of law and fact.  All class members are card holders whose payment-card information

was accessed in the data breach.  Common questions include whether defendants negligently

breached any duty to safeguard payment-card data and whether the breach occurred as a result of defendants' negligence.  The proposed class satisfies Rule 23(a)(2).

The claims of the fifteen named plaintiffs are typical of the claims of members of the class.  Plaintiffs allege injury as a result of defendants' failure to secure their payment systems and the resulting breach of payment card data, and the selling of their payment card information by a hacker collective going by the name of "JokerStash" or "Fin7."  Certain plaintiffs have alleged that they were victims of fraudulent charges and withdrawals as a result of the breach.  The proposed class satisfies the typicality requirement of Rule 23(a)(3).

Plaintiffs have fairly and adequately protected the interests of the class, as required by Rule 23(a)(4).  The interests of the individual plaintiffs are aligned with members of the class.  The individual plaintiffs have submitted declarations that describe their participation in the litigation, including the review of pleadings, communications with lawyers, and review of materials related to the settlement and mediation.  (Docket # 204 to 218.)  Plaintiffs have the same interests at stake as those of the class members.  They satisfy the adequacy requirement of Rule 23(a)(4).

In addition to satisfying Rule 23(a), a class action must also satisfy one of the requirements of Rule 23(b).

Rule 23(b)(3) permits certification if "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the

issues subject only to individualized proof.  <u>Waggoner v. Barclays PLC</u>, 875 F.3d 79, 93 (2d Cir. 2017).

       The Court concludes that Rule 23(b)(3) is satisfied because resolution of plaintiffs' claims can be satisfied with generalized proof, and these generalized issues are more substantial than any individualized proof.  The issue of whether defendants were negligent in securing payment-card data predominates over all plaintiffs' claims, and generalized proof of any negligence on defendants' part is more substantial than the issues subject only to individualized proof related to a particular plaintiff.  The Court therefore concludes that common questions of fact and law predominate over individual questions, and that a class action is superior to other methods of adjudication.  The proposed class satisfies Rule 23(b)(3).

       The settlement class will therefore be certified.

II.    <u>The Motion for Final Approval Will Be Granted.</u>

A.  Fairness, Reasonableness and Adequacy of the Settlement from the <u>Standpoint of the Settlement Class</u>

       Rule 23(e) provides that "[t]he claims . . . of a certified class . . . may be settled, voluntarily dismissed, or compromised only with the court's approval."  Rule 23(e)(2) provides that if a proposed settlement "would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether" certain specific factors are satisfied.  The Advisory Committee's notes on Rule 23(e)(2) state that the goal of the amendment "is not to displace any factor" previously adopted by any United States Court of Appeals, "but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal."  The Advisory Committee explained that in certain jurisdictions, lengthy, multifactor tests risked distracting courts and parties from focusing on the key issues in a settlement review.

Many of the requirements set forth in the amendments to Rule 23(e)(2) have long been used in the nine-factor test adopted by <u>City of Detroit v. Grinnell Corp.</u>, 495 F.2d 448, 463 (2d Cir. 1974).  To the extent that certain of the <u>Grinnell</u> factors are not encompassed by Rule 23(e)(2), the Court will discuss them separately.

The Court will first review the factors set forth by Rule 23(e)(2), and then address the additional <u>Grinnell</u> factors.

> **B.  Rule 23(e)(2)(A): Whether Class Representatives and Class Counsel <u>Have Adequately Represented the Class.</u>**

The Court will discuss the work of class counsel and the class representatives in more detail in connection with the attorneys' fees application.  However, for Rule 23(e) purposes, the Court concludes that the class representatives and class counsel have adequately represented the class.  Plaintiffs' counsel drafted a consolidated pleading after three separate actions were transferred to this District following their filing in federal district courts of California, Delaware and Tennessee.  In its 32-page Opinion and Order of May 7, 2019, the Court granted in part and denied in part defendants' motion to dismiss the claims of plaintiff Alexandra Rudolph under Rules 12(b)(1) and 12(b)(6).  In November 2019, defendants moved to dismiss plaintiffs' Second Amended Consolidated Complaint.  (Docket # 148.)  That motion was fully submitted when the parties reach an agreement in principle to settle this case.  Plaintiffs' counsel engaged in some document discovery prior to a mediation session that resulted in the resolution of this case.

The fifteen individual plaintiffs have submitted declarations describing their participation in the action.  (Docket # 204 to 218.)  As an example, plaintiff Alexandra Rudolph states that she reviewed drafts of the plaintiffs' pleadings, conferred with counsel before mediation, and discussed and executed the settlement agreement.  (Docket # 204.)  As another

example, plaintiff Cassondra Joseph states that, as a licensed attorney, she closely followed

developments in the case and closely reviewed relevant case documents.  (Docket # 210.)

The adequacy of class representation on the part of plaintiffs' counsel and the

plaintiffs weighs in favor of the proposed settlement.

### C.   Rule 23(e)(2)(B): The Settlement Was Negotiated at Arm's Length.

The parties retained retired Judge Diane Welsh as a private mediator, and held

one full-day, in-person mediation session on March 11, 2020.  (Pollack & Peter Dec. ¶ 13.)  The

parties reached a tentative agreement in principle at the close of that session and agreed to a

Memorandum of Understanding in May 2020.  (Pollack & Peter Dec. ¶ 13.)  The parties

thereafter continued to negotiate details of the Settlement Agreement.  (Pollack & Peter Dec. ¶

13.)

The Court concludes that the settlement was negotiated at arm's length, and that

this factor weighs in favor of approving the proposed settlement.

### D.   Rule 23(e)(2)(C): The Relief Provided to the Class Is Adequate.

#### 1.   Rule 23(e)(2)(C)(i): Costs, Risks and Delay of Trial and Appeal.

This is a moderately complex action.  Plaintiffs have asserted common-law claims

and claims under the consumer-protection statutes of numerous states.  The facts of the case

involve data-security issues at points of payment in retail stores.  As discussed, the Court granted

in part and denied in part the motion to dismiss the claims of plaintiff Rudolph, after defendants

challenged whether the complaint had plausibly alleged a claim for relief and also whether the

plaintiff had adequately identified an injury-in-fact that was sufficient to confer Article III

standing.  At the time that the parties reached an agreement in principle to settle the case, a fully

briefed motion to dismiss the consolidated class action complaint was pending before the Court,

and that motion also disputed whether plaintiffs had adequately alleged injuries in fact and whether they had plausibly stated a claim for relief.

In the event that some portion of plaintiffs' claims survived the defendants' motion to dismiss, the case would likely have required extensive document discovery, a contested motion for class certification, and a summary judgment motion, followed by the trial of any surviving claims.  Continued litigation, including discovery, adjudication of a summary judgment motion, and trial, would have prolonged the litigation and significantly increased the parties' expenses.

The resolution of this case was also delayed after an automatic stay was put into place when Lord & Taylor filed a suggestion of bankruptcy.  (Docket # 162.)  The stay was in effect from August 5, 2020 through March 26, 2021.  (Docket # 167.)

The risks of continued delay and increased expenses is heightened somewhat by ongoing uncertainties relating to the Covid-19 pandemic and its aftermath.

For these reasons, the delay and expense of litigating this case through trial on the merits would have been significant, with no guarantee of recovery to the plaintiffs.  This weighs in favor of the proposed settlement.

2.  Rule 23(e)(2)(C)(ii): Effectiveness of the Proposed Method of Distributing Relief to the Class.

As discussed, the proposed plan of allocation provides for what plaintiffs describe as "two tiers" for relief.  Class members in "Tier 1" receive a single payment of $30 if they demonstrate that they engaged in a payment-card transaction during the period of May 1, 2017 to April 1, 2018, and indicate that they spent time monitoring transactions on the affected card. Claimants do not need to document out-of-pocket expenses or further substantiate any claimed injury.  Class members in "Tier 2" will receive a payment of $30, plus additional reimbursement

for out-of-pocket expenses incurred as a result of fraudulent activity or other documented losses – such as payment of costs to monitor or resolve identity theft – traceable to the data breach.

The Court concludes that this is an effective method of distributing relief to the class. A payment of $30 is fair, reasonable and adequate compensation to a retail customer who spent some time monitoring financial accounts following a data breach but did not incur additional losses, such as fraudulent charges or withdrawals. This award is consistent with the relief provided to class members in other data-breach cases who did not suffer out-of-pocket losses. See, e.g., In re: Arby's Restaurant Grp., Inc. Data Sec. Litig., 17 Civ. 1035 (N.D. Ga.) (WMR) (Docket # 187-1) (approving award of up to $30 to claimants who did not have out-of-pocket losses); Bokelman v. FCH Enters., Inc., 18 Civ. 209 (D. Hawaii) (Docket # 59) (approving award of $10 to claimants who did not have out-of-pocket losses). The Court also concludes that the reimbursement to Tier 2 plaintiffs fairly, adequately and reasonably compensates them for documented out-of-pocket expenses, in an amount not to exceed $5,000. This distinction between the two tiers of plaintiffs is reasonable given that they experienced different types of injury.

The Court concludes that the plan of allocation is designed to fairly allocate payment to members of the settlement class.

> 3. Rule 23(e)(2)(C)(iii): The Terms of the Proposed Attorneys' Fees, Including the Timing of Payment.

Plaintiffs' counsel seeks attorneys' fees and expenses not to exceed $1,400,000. Specifically, they seek $1,346,799.40 in attorneys' fees and $53,200.60 in expenses, which amount to a total sum of $1,400,000.

This fees award is accounted for separately from the payment to the class. Plaintiffs' counsel states that the lodestar of their reasonable hourly fees would total

$3,161,778.36, and that the fees request is a negative lodestar multiplier of 0.44.  At the same time, plaintiffs' attorneys' fees, exclusive of expenses, are a multiplier of 4.83 against the total amount of $278,483.81 paid to the class.

As to the timing of the payment, the Settlement Agreement provides that defendants shall pay class counsel's fees and expenses no later than ten days after thirty days have elapsed from the entry of final judgment, provided that no appeal or motion for reconsideration has been made.  (Settlement Agrmt. ¶¶ 8.5, 10.1.)  The timing is reasonable and ensures that fees would be paid only after the class action settlement has been finally approved and judgment has been entered.

The Court will discuss the fees application in greater detail below.  For the purposes of Rule 23(e)(2)(C)(iii), the Court concludes that the attorneys' fees is not an obstacle to final approval of the class action settlement.  The Court places weight on the fact that the Settlement Agreement provides that, in the event the Court rejects or modifies the motion for fees and expenses, such an order "shall not serve as a basis to avoid or terminate this Settlement Agreement."  (Settlement Agrmt. ¶ 8.3.)  The Court also affords weight to the fact that any payment of attorneys' fees shall not be made until at least thirty days have elapsed after the entry of final judgment.

4. Rule 23(e)(2)(C)(iv): Any Agreement Required to be Identified under Rule 23(e)(3).

Rule 23(e)(3) states: "The parties seeking approval must file a statement identifying any agreement made in connection with the proposal."  Plaintiffs' counsel has stated "that no agreements have been made in connection with the proposed Settlement apart from those identified in the Motion."  (Pollack & Peter Dec. ¶ 28.)

The parties have adequately identified their agreement pursuant to Rule 23(e)(3).

5.  Rule 23(e)(2)(C): Whether the Proposal Treats Class Members
Equitably Relative to Each Other.

The Court has previously described the plan of allocation, which is intended to

allocate to each class member a payment from the settlement fund according to whether they

seek 1.) an award of $30 based on the fact that their card data was breached and spent some time

monitoring their accounts, or 2.) reimbursement for out-of-pocket expenses incurred as a result

of the breach, with payment capped at $5,000.  The plan of allocation was designed to provide

equal treatment to those who did not incur out-of-pocket expenses while also allowing for

individualized compensation to class members who incurred expenses as a result of the breach.

The plan of allocation compensates members of the class equitably relative to

each other.

E.  The *Grinnell* Factors.

As mentioned, the Advisory Committee's notes to Rule 23(e)(2) state that the

goal of the recent amendments were not intended to displace any factor adopted by any court of

appeals, and that the Second Circuit has long used the nine-factor Grinnell test to evaluate the

substantive fairness of a proposed class action settlement.  See 495 F.2d at 463.

In applying Rule 23(e), the Court has applied many of the Grinnell factors,

including the complexity, expense and likely duration of the litigation; the stage of proceedings

and amount of discovery, and the risks of establishing liability and damages.

1.  The reaction of the class to the settlement.

The reaction to the class has been favorable.  There have been no objections to the

settlement and no requests for exclusion.  This factor weighs in favor of approval.

2.   <u>The size of settlement in the range of possible recovery.</u>

Plaintiffs have not offered any fixed figures as to the possible range of recovery. They explain that it is "challenging" to estimate the range of reasonableness with precision because no data-breach class action has reached the trial stage.  While it is not feasible to measure the settlement against a possible outcome at trial, the settlement payments to the class are consistent with payments in similar data-breach settlements.  Plaintiffs cite a variety of class-action settlements where the payments to individual class members were comparable to the amounts in this settlement, including the above-cited 2017 <u>Arby's</u> case in the Northern District of Georgia that provided for settlement payments in two tiers with a maximum amount of $5,000 based on out-of-pocket loss.  17 Civ. 1035 (N.D. Ga.) (Docket # 187-1).  Comparable data-breach cases have provided lower settlement payments to class members, with relief that includes a payment of $10 or merchant coupons.  (<u>See</u> Docket # 176 at 20 n.14 (summarizing cases).)

This factor weighs in favor of approval.

3.   <u>Risks of Maintaining the Class Action through Trial.</u>

Defendants would likely have opposed any motion for class certification.  A contested motion would have increased the parties' expenses and further delayed proceedings. Defendants likely would have urged that individualized proof of cardholder transactions and individual plaintiffs' injuries caused by the breach were more substantial than the generalized proof required to establish plaintiffs' claims.  As noted, the parties point to no data breach class actions that have been resolved at trial.

This factor weighs in favor of approval.

4.   The Ability of Defendants to Withstand Greater Judgment.

Plaintiffs note that defendants, like many retailers, faced a difficult business environment during the Covid-19 pandemic.  Further, this proceeding was stayed following the suggestion of bankruptcy of the parent company of defendant Lord & Taylor, which suggests that the resources of Lord & Taylor may be somewhat limited.

This factor weighs in favor of approval.

F.   Notice to the Class.

Rule 23(c)(2)(B) requires potential class members to receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort.  The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means."  Plaintiffs have principally relied on two different methods of providing notice to the class: banner advertisements on the internet and "earned media" obtained through a press release sent to traditional and online media outlets.

The Court has previously described the work of the claims administrator to disseminate notice to the class, and specifically its reliance on the use of paid banner ads targeted to the core customer demographic at defendants' brick-and-mortar stores.  Plaintiffs have estimated that approximately three million payment cards were affected by the data breach. (Pollack & Peter Dec. ¶ 12.)  The claims administrator has stated that banner ads about the settlement reached 22,149,773 total viewer impressions.  (4th Simmons Dec. ¶ 11.)  The dedicated settlement website was accessed 68,763 times by 56,359 users.  (Id. ¶ 14.)  Ultimately, the claims administrator determined that it had received 7,529 valid Tier 1 claims and 27 valid Tier 2 claims.  (4th Simmons Dec. ¶ 17; 5th Simmons Dec. ¶ 19.)

The number of claims submitted reflects a response rate of approximately 0.25% out of 3 million affected payment cards, and the number of visits to the settlement website totaled approximately 1.87% of the number of affected payment cards.[2]  At the fairness hearing, the Court inquired about the effectiveness of the notice provided to the class.  Counsel credibly explained why they did not have a way of identifying individual cardholders affected by the breach, including those with store-branded cards.  (3/1/22 Tr. at 5, 14.)  Counsel also explained that defendants were unable to post notice to the class on the defendants' websites because they no longer have a controlling ownership interest in the companies that run the retailers' e-commerce businesses.  (Id. at 15-16.)  Counsel acknowledged that it was difficult to know precisely why the response rate from the class was so low, but speculated that many affected cardholders did not know that their card information had been accessed in a data breach, and they therefore did not spend time monitoring account information: "Not everyone that had a card that was affected was aware that they were the victim of a data breach or were, in fact, actually the victim of the data breach."  (3/11/22 Tr. at 30; see also id. at 28-29 ("Your Honor, it's been quite a number of years since the data breach happened and people sometimes decide they're not going to bother to do it.  It was a pandemic and people maybe decided they just had more pressing serious issues.").)

Given the size of the class and plaintiffs' inability to identify the individual members, the use of paid, targeted banner advertisements to disseminate notice was the best method practicable under the circumstances.  "[T]he notice provided to absent class members

---

[2] The number of affected payment cards may exceed the number of persons comprising the overall class because the same consumer may have used different payment cards in different transactions during the eleven-month period in which the data breach occurred.  (1/11/22 Tr. at 9.)  The figure of 3,000,000 affected cards is only an approximation of the likely total class size.  Plaintiffs' counsel has estimated that the number could be as few as a million people. (Id. at 10.)  By contrast, the claims administrator estimated a class size of 3,000,000 at the time plaintiffs moved for preliminary approval of the settlement.  (1st Simmons Dec. ¶ 17.)

must be the best practicable, reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." Hecht v. United Collection Bureau, Inc., 691 F.3d 218, 224 (2d Cir. 2012) (quotation marks omitted). "[W]hen courts have approved notice by publication, they have tended to do so where the notices either ran more than once or appeared in more than one publication." Id. at 224-25. "It is clear that for due process to be satisfied, not every class member need receive actual notice, as long as class counsel 'acted reasonably in selecting means likely to inform persons affected.'" In re Adelphia Commc'ns Corp. Sec. & Derivative Litig., 271 Fed. App'x 41, 44 (2d Cir. 2008) (summary order) (quoting Weigner v. City of N.Y., 852 F.2d 646, 649 (2d Cir. 1988)). Online media campaigns have become a widely accepted method of distributing notice to a consumer class. See In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig., 527 F. Supp. 3d 269, 273-74 (E.D.N.Y. 2021) (collecting cases).

The Court concludes that the class received the best notice that was practicable under the circumstances, mindful of the practical problems presented in this case in contacting cardholders directly. Banner ads targeted to the key demographics of defendants' customer base reached 22,149,773 total viewer impressions and the class settlement website was accessed 68,763 times by 56,359 users. Publication of the notice was specifically targeted to persons who were most likely to be members of the class. The Court concludes that the notice to the class satisfies Rule 23(c)(2)(B).

G.  The Settlement Is Approved.

Having reviewed the factors set forth by Rule 23(e)(2) and the additional factors set forth in the Second Circuit's Grinnell decision, the Court concludes that the proposed

settlement is fair, reasonable and adequate to the class.  The settlement will therefore be finally approved, as set forth in a separate Order.

THE MOTION FOR ATTORNEYS' FEES WILL BE GRANTED WITH MODIFICATION.

       A.  <u>Overview of the Fees Application.</u>

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."  Rule 23(h).  As mentioned, plaintiffs' counsel seeks $1,346,799.40 in attorneys' fees and $53,200.60 for the reimbursement of expenses, for a total award of $1.4 million.  Plaintiffs state that the combined lodestar of plaintiffs' fees is $3,161,788.36, based on 4,666.03 hours of attorney and professional time, and that the application reflects a negative lodestar multiplier of 0.44.  (Fees Mem. at 19.) In support of the application, plaintiffs have submitted attorney declarations from the fourteen law firms that have participated in this case.  (Docket # 190 to 203.)

The Settlement Agreement includes a series of fees provisions that provide for the payment of attorneys' fees independent of the class's eventual recovery:

> 8.1. The Parties did not negotiate the payment of the Representative Plaintiffs' attorneys' fees, costs, expenses and/or service awards, as provided for in ¶¶ 8.2 and 8.3, until after the substantive material terms of the Settlement had been agreed upon, other than that the Parties would discuss and negotiate reasonable attorneys' fees, costs and expenses, and a service award to Representative Plaintiffs, to be separately paid by Defendant Hudson's Bay Company to the extent ordered by the Court.  Defendants and Class Counsel then negotiated and agreed as follows:
>
> 8.2. Class Counsel will request from the Court, and Defendant Hudson's Bay Company has agreed not to object to Class Counsel's request for and to pay (subject to Court approval to the extent approved) an award of reasonable attorneys' fees, costs, and expenses as approved by the Court up to the amount of $1,400,000. Class Counsel, in their sole discretion, shall allocate and distribute the amount of attorneys' fees and costs and expenses awarded by the Court.

> 8.3. The Court's rejection, non-approval or reduction of Class Counsel's request for an award of attorneys' fees, costs and expenses shall not serve as a basis to avoid or terminate this Settlement Agreement. The Parties agree that the relief to the Settlement Class reflected in the Settlement Agreement herein is fair, reasonable and adequate and that the Court can approve the Settlement Agreement separately from the amount of the attorneys' fees, costs and expenses.

(Settlement Agrm't ¶¶ 8.1-8.3.)

Although there is no common fund, plaintiffs apply for a percentage-based fees award, to be calculated from "the total maximum amount to be paid by Defendants upon approval by the Court . . . ." (Fees Mem. at 3.) Plaintiffs calculate that "total maximum amount" as $3,665,000. (Id.) This figure incorporates the $2 million "Aggregate Cap," $1.4 million in attorneys' fees and expenses, $250,000 in the costs of notice and claims administration, and $15,000 in requested service awards to the individual plaintiffs. (Id.) Applying this arithmetic, a fees award of $1,346,799.40 "amounts to 36.7% of the total funds made available by Defendants." (Id. at 5; see also id. at 4 ("Moreover, despite the fact that Defendants have agreed to pay attorneys' fees and expenses awarded by this Court directly, and not as part of a common fund, this amount must be considered as part of the $3,665,000 settlement value as well, because these sums would otherwise normally be paid by class members from a common fund.").)

An aggregate cap is a perfectly reasonable way for parties to settle a case such as this, where it may be difficult to know how many class members will seek recovery. The amount of the cap does not create a fund but places a limit on the defendant's payment to the class. A defendant who is confident that the number of claimants are relatively few and the per-claimant amount is low could reasonably settle without a cap because the cap bears little relationship to its true exposure. But it would not, for example, justify valuing the settlement at the shareholders' equity in a defendant corporation.

On a fees application, "the percentage method . . . directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation." Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 121 (2d Cir. 2005) (citation and quotation marks omitted); see also McDaniel v. Cnty. of Schenectady, 595 F.3d 411, 419 (2d Cir. 2010) ("the percentage method has the advantage of aligning the interests of plaintiffs and their attorneys more fully by allowing the latter to share in both the upside and downside risk of litigation . . . .").

Separately, the Court's ability to evaluate the attorney lodestar is hampered by the modest showing that plaintiffs' counsel has made as to their time and labor. Plaintiffs' counsel has not submitted detailed billing records or other precise descriptions of work performed, and instead submit summary tables that list each attorney or professional who billed time on the case, the number of hours expended, that person's hourly rate and the total dollars billed. For example, Timothy J. Peter of Faruqi & Faruqi, LLP, is identified as "Chair of Consumer Protection Division and Partner; over 10 years" with 451.10 hours billed at an hourly rate of $775, for a "Total Amount Billed" of $349,602.50. (Peter Dec. ¶ 15 (Docket # 190).) Peter's declaration does not provide detail on the work performed by his law firm. He states that class counsel as a whole "has conducted a thorough examination and investigation of the facts and law relating to the matters in this case. This includes substantial review and analysis of Defendants' documents and data, and engaging a top data security expert to review Defendants' PFI Report and all technical aspects of this Litigation, which led to substantial changes to Defendants' data security measures for the benefit of the Settlement Class Members and the general public." (Peter Dec. ¶ 6.) Peter states: "In my judgment and based on my years of experience in class

action litigation and other litigation, the number of hours expended, and the services performed by my firm, were reasonable and necessary for my representation of Plaintiffs." (Id. ¶ 17.)

In a common fund case where a plaintiff seeks a percentage of the fund, the lodestar serves only as a cross-check and need not have the detail of a fee application made on an hourly-rate basis. As a cross-check, the submission is adequate. As a fee application based on hourly rates and work performed, it is not.

B.  Legal Standard.

In reviewing a fee application, the "court is 'to act as a fiduciary who must serve as a guardian of the rights of absent class members.'" Central States Southeast and Southwest Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C., 504 F.3d 229, 249 (2d Cir. 2007) (quoting Grinnell, 560 F.2d at 1099); accord McDaniel, 595 F.3d at 419 ("we . . . reaffirm the requirement of a 'searching assessment' regarding attorneys' fees 'that should properly be performed in each case.'") (quoting Goldberger v. Integrated Resources, Inc., 209 F.3d 43, 52 (2d Cir. 2000)); Wal-Mart, 396 F.3d at 122 (noting the district court's "jealous regard for absent class members . . . ."). A fees award "must reflect 'the actual effort made by the attorney to benefit the class'. . . ." Central States, 504 F.3d at 249 (quoting Grinnell, 560 F.2d at 1099).

"In common fund cases, courts typically use either the lodestar method or the percentage method to compute attorneys' fees." Id. "It is up to the district court, rather than counsel, to choose whether to use the lodestar or percentage methods." Allen v. Taylor, 795 Fed. App'x 79, 80 (2d Cir. 2020) (summary order); accord Goldberger, 209 F.3d at 50 ("[B]oth the lodestar and the percentage of the fund methods are available to district judges in calculating

attorneys' fees in common fund cases.").  Under either approach, it is the Court's duty "to prevent unwarranted windfalls for attorneys."  Id. at 49.

"The lodestar method multiplies 'the numbers of hours expended by each attorney involved in each type of work on the case by the hourly rate normally charged for similar work by attorneys of like skill in the area and, once this base or lodestar rate is established, . . . [the court] determine[s] the final fee by then deciding whether to take into account other less objective factors, such as the risk of litigation, the complexity of the issues, and the skill of the attorneys.'"  Central States, 504 F.3d at 249 (alterations and ellipsis in original) (quoting Savoie v. Merchants Bank, 166 F.3d 456, 460 (2d Cir. 1999)).  "[T]he reasonableness of the claimed lodestar can be tested by the court's familiarity with the case (as well as encouraged by the strictures of Rule 11)."  Goldberger, 209 F.3d at 50.

Plaintiffs' fees application seeks an award as a percentage of the overall "settlement value" while applying a lodestar cross-check.  In a common fund case, a court may calculate a fees award based on a percentage of the total recovery.  See Goldberger, 209 F.3d at 47.  "In determining what percentage to award, courts have looked to the same 'less objective' factors that are used to determine the multiplier for the lodestar."  Id.  "[T]he percentage method . . . directly aligns the interests of the class and its counsel and provides a powerful incentive for the efficient prosecution and early resolution of litigation."  Wal-Mart, 396 F.3d at 121 (citation and quotation marks omitted).  "[T]he lodestar remains useful as a baseline even if the percentage method is eventually chosen.  Indeed, we encourage the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage.  Of course, where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court."  Goldberger, 209 F.3d at 50 (internal citation

26

omitted); see also Fresno Cnty. Employees' Ret. Ass'n, 925 F.3d at 68 ("A common-fund-percentage fee must still be evaluated for reasonableness, but may exceed the lodestar – i.e., it may be less than, equal to, or greater than the lodestar.") (internal citation omitted).

"Of course, no matter which method is chosen, district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: (1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." Goldberger, 209 F.3d at 50 (quotation marks and ellipsis omitted). "[A] district court can avoid a 'windfall' by adjusting 'the percentage awarded in order to come up with a fee it deems reasonable in light of the Goldberger factors.'" See Kornell v. Haverhill Ret. Sys., 790 Fed. App'x 296, 298 (2d Cir. 2019) (summary order) (quoting Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 437 (2d Cir. 2007)).

In urging that a fees award should be based on a $3,665,000 total "settlement value" inclusive of a $2 million "Aggregate Cap" instead of the $278,483.81 actually recovered by the class, plaintiffs point to the Second Circuit's decision in Masters. There, the district court approved the settlement of an antitrust class action that provided for a common fund totaling $21,855,000. 473 F.3d at 430. Plaintiffs sought a fee award of 33.33% of the fund ($7,285,000), plus reimbursed expenses ($1,590,164.65), for a total of $8,875,164.65, against a lodestar of $10,702,324.65. Id. at 431. The district court observed that value of fees and expenses amounted to approximately 40% of the total fund. Id. At the time of final approval, the value of class members' submitted claims totaled $9,338,958.29. Id. The district court awarded attorneys' fees of 40% against claims submitted to the settlement fund, as opposed to the overall

settlement fund, explaining that a higher fees award would amount to a "windfall" to the plaintiffs' attorneys.  Id. at 432.

The Second Circuit concluded that it was error to calculate attorneys' fees on the basis of claims made against the fund, as opposed to the fund's total value:  "The entire Fund, and not some portion thereof, is created through the efforts of counsel at the instigation of the entire class.  An allocation of fees by percentage should therefore be awarded on the basis of the total funds made available, whether claimed or not."  Id. at 437.  It explained:

> Our own cases refer to "percentage of the fund," and "percentage of the recovery."  We take these references to be to the whole of the Fund.  Use of the entire Fund as a basis for the computation does not necessarily result in a "windfall" because the court may always adjust the percentage awarded in order to come up with a fee it deems reasonable in light of the Goldberger factors.

Id. (emphasis in original; quoting Wal-Mart, 396 F.3d at 121; Goldberger, 209 F.3d at 47).  It observed that even unclaimed portions of a common fund were part of a payment to the class:  "[T]he entire fund created by the efforts of counsel presumably is 'paid to the class,' even if some of the funds are distributed under the Cy Pres Doctrine."  Masters, 473 F.3d at 437-38; see also id. at 435 (the Cy Pres Doctrine "allocate[s] the funds to those charities thought to benefit the class, either directly or indirectly.").

C.  The $2 Million "Aggregate Cap" Is Not Comparable to a Fund that Is Paid to the Class.

In contrast to the Masters case, there is no "fund" that benefits this class, as plaintiff's counsel confirmed at the fairness hearing when he was asked about the unpaid portion of the "Aggregate Cap":  "THE COURT: So who gets the 1.8 million?  MR. PETER: It's never paid out, because it's not put into a fund in the first place."  (1/11/22 Tr. at 18.)  The reasoning of Masters is premised on the existence of a common fund that included unclaimed portions to be distributed through the application of the cy pres doctrine.  Here, the "Aggregate Cap" of $2

28

million is an aspirational figure, and any amount that is not paid to claimants does not confer a benefit to the class, as confirmed by plaintiffs' counsel.  Because the amount is "not put into a fund in the first place," the parties could have agreed to an "Aggregate Cap" of virtually any figure – $10 million or $100 million – and the payment to the class would remain $278,483.81.

The distinction between the parties' "Aggregate Cap" and distributions made from a common fund is underscored by defendants' hands-on role in administering the fund.  At the fairness hearing, defense counsel described his participation in the claims administration process, including the initial insistence that claimants without a proof of transaction mail a hard copy of the completed claims form instead of submitting it online.  (3/1/22 Tr. at 10.) Defendants' counsel explained:

> We were in constant communication with the settlement administrator.  We got the reports, we were looking at the claims that were being filed, and it was our concern that really animated the need to have the mail processed for forms or for claims that would be made without documentation because it would be too easy for someone to just click a button and submit multiple claims.  It's a lot harder to submit multiple claims by mail.
>
> So, while we wanted to make it easy for someone who would submit a single claim, and we did that online, if someone was going to try to gain [sic] the system and submit multiple claims, we wanted to make that harder.  So that's why we set up the system the way we did.

(Id.)  When class members are paid out of a common fund, the defendants do not have an incentive to limit or monitor payments to class members.  Here, defendants played a supervisory role in monitoring payments to the class, and saw to it that a mailing requirement that was arguably more cumbersome than an electronic submission was put into place for class members who had valid claims but could not produce documentation of their transactions.  While defendants justify this as an anti-fraud measure, it also had the effect of discouraging the

submission of valid claims while limiting the amount that defendants ultimately paid to the class. As discussed, the parties ultimately agreed to dispense with the requirement that a claimant mail a hard copy, and the Claims Administrator accepted as valid undocumented claims that were submitted online.

Unlike the moneys placed into a common fund, unpaid portions of the "Aggregate Cap" did not inure to the benefit of the class. Only $278,483.81 will be paid to the class, out of the available $2 million. The cap's remaining $1,721,516.19 is of no benefit to any class member. In calculating a fees award, the Court will consider the $278,483.81 that will be paid to the class and not the $2 million "Aggregate Cap."

     D.  <u>The Time and Labor Expended by Counsel and the Attorney Lodestar.</u>

        1.  Plaintiffs' Submissions Reflect a Redundant and Inefficient Allocation of <u>Attorney Time and Labor.</u>

Fourteen law firms billed a total of 4,666.03 attorney and professional hours on this case. The firms' work hours and hourly rates are set forth in the attorney declarations filed at docket entries 190 through 203.

The joint declaration of Janine L. Pollack and Timothy J. Peter summarizes attorney work performed on behalf of the class. It asserts that counsel "spent a significant amount of time identifying and investigating Plaintiffs' claims." (Pollack & Peter Dec. ¶ 10.) Prior to the filing of a consolidated class action complaint, three putative actions were brought in federal district courts in Delaware, Tennessee and California, each with their own pleading. (Id. ¶¶ 5-7.) The Consolidated Class Action Complaint was filed, followed by the Second Consolidated Amended Class Action Complaint, which removed certain plaintiffs and added certain claims. (Id. ¶¶ 8-9.)

Some document discovery took place.  Plaintiffs' counsel "served on Defendants various discovery requests and notices of intent to serve third-party subpoenas."  (Id. ¶ 11.)  Defendants produced "a substantial number of documents," including from payment-card brands, "which allowed Class Counsel to have a robust understanding of the factual and legal issues in the case."  (Id. ¶ 11.)

In November 2019, defendants moved to dismiss the Second Consolidated Amended Class Action Complaint.  (Id. ¶ 12.)  Defendants filed opposition papers, and the motion was fully briefed.  (Id.)

While the motion to dismiss was sub judice, the parties agreed to attend a session before a private mediator, retired Judge Diane Welsh.  (Id. ¶¶ 12-13.)  In anticipation of the mediation, defendants produced "a substantial number of documents," including a forensic report that detailed the malware responsible for the breach, correspondence between defendants and financial institutions, defendants' internal communications about data security, and insurance policies.  (Id. ¶ 12.)  Plaintiffs also produced certain documents.  (Id.)  On March 11, 2020, the parties attended a full-day, in-person session before the mediator, which concluded with a tentative agreement in principle that was later memorialized in a formal Memorandum of Understanding.  (Id. ¶ 13.)  The parties continued to negotiate the details of the Settlement Agreement, through April 21, 2020.  (Id.)

Pollack and Peter state that counsel's work on the case has required a thorough investigation of the facts and law, including "substantial review and analysis" of defendants' documents and data, and engaging a "top data security expert" to review the technical aspects of the breach.  (Id. ¶ 20.)

The Court has also reviewed the declarations submitted by the individual law firms in support of the fees application.  These declarations offer generic, broadly similar descriptions of the work performed on the case:

- Faruqi and Faruqi, LLP, which billed 2,042.70 hours on this case, states that its work included "substantial review and analysis of Defendants' documents and data, and engaging a top data security expert to review Defendants' PFI Report and all technical aspects of this Litigation, which led to substantial changes to Defendants' data security measures for the benefit of the Settlement Class Members and the general public." (Peter Dec. ¶¶ 6, 15 (Docket # 190).)
- Calcaterra Pollack LLP, which billed 323.9 hours on this case, states that its work included "factual investigation, conducting legal research regarding Plaintiffs' claims; drafting pleadings; discovery issues and documents; multiple client conferences for the purposes of, among other things, review of relevant facts, status of the matter and strategy, and review and discussion of the Settlement Agreement; corresponding with counsel for Defendants; assisting Plaintiffs in gathering evidentiary materials; attending the settlement mediation; negotiation of the Settlement Agreement and exhibits with Defendants; working with the Settlement Administrator; and working on the settlement papers to seek final approval of the settlement."  (Pollack Dec. ¶¶ 7, 9 (Docket # 191).)
- TheGrantLawFirm, PLLC, which billed 62.62 hours on this case, states that its work included "[s]peaking to the client initially, and investigating whether a potential action against the defendants ("Defendants") existed; Drafting and filing an initial complaint on behalf of named Plaintiff Harris; Speaking to potential lead counsel and other counsel about strategy and the proceedings before the Judicial Panel on Multi-district Litigation ("MDL"); Reviewing and analyzing the MDL filings and filing a Notice of Appearance before the MDL; Filing a notice of voluntary dismissal of the Harris Action, and reviewing and revising the consolidated complaint filed in Delaware; reviewing and revising the the [sic] Second Amended Consolidated Complaint ("SAC"), reviewing motions to dismiss filed by Defendants, reviewing and revising a draft mediation statement and collecting further documents of Plaintiff Harris for the mediation; reviewing the results of the.mediation with Plaintiff Harris including the term sheet and reviewing the Settlement Agreement and attendant terms with Plaintiff Harris, and obtaining her agreement to the terms."  (Grant Dec. ¶ 8 (Docket # 192).)
- Goldenberg, Schneider, LPA, which billed 103.2 hours on this case, states that its work included "initial factual investigation; legal research regarding Plaintiffs' potential claims; drafting pleadings; multiple client conferences for the purposes of vetting potential

plaintiffs to serve as class representatives; attending organizational and strategy conferences; and reviewing the Settlement Agreement and related documents." (Goldenberg Dec. ¶¶ 6, 8 (Docket # 193).)

- Andersen Sleater Sianni, which billed 73.10 hours on this case, states that its work included "conducting legal research regarding Plaintiffs' potential claims; drafting pleadings; research and analysis while the case was pending in the State of Delaware, extensive involvement with motion to transfer venue and related issues and communications with local defense counsel in Delaware, various telephonic strategy sessions with co-counsel, and review of mediation and settlement papers." (Sianni Dec. ¶¶ 4, 6 (Docket # 194).)

- Kaplan Fox & Kilsheimer LLP, which billed 338 hours on this case, states that its work included "initial factual investigation, conducting legal research regarding Plaintiffs' potential claims; drafting pleadings; drafting portions of the opposition to defendants' motion to dismiss; multiple client conferences for the purposes of, among other things, review of relevant facts, status of matter and strategy, and review of the potential Settlement Agreement." (King Dec. ¶¶ 4, 6 (Docket # 195).)

- Levin, Sedran & Berman, which billed 298.25 hours on this case, states that its work included "initial factual investigation, conducting legal research regarding Plaintiffs' potential claims; drafting pleadings; multiple client conferences for the purposes of, among other things, review of relevant facts, status of matter and strategy, and review of the potential Settlement Agreement; corresponding with counsel for Defendants; assisting Plaintiffs in gathering evidentiary materials; attending the settlement mediation and drafting the settlement papers." (Schaffer Dec. ¶ 6 & Ex. B (Docket # 196).)

- Gary E. Mason of Mason Lietz & Klinger LLP has submitted a declaration that describes the work performed on the case at his current firm, as well as his former firm, Whitfield Bryson & Mason LLP. (Mason Dec. ¶ 1 (Docket # 197).) The two firms billed a combined 101.4 hours, with work that included "investigating the facts and law relevant to the Plaintiffs' claims; drafting and filing the original and amended Complaints; drafting pleadings; multiple client conferences for the purposes of, among other things, review of relevant facts, status of matter and strategy, and review of the potential Settlement Agreement; assisting Plaintiffs in gathering evidentiary materials; working on settlement papers and gathering Plaintiffs' signatures on settlement papers." (Id. ¶¶ 5, 7-8.)

- Morgan and Morgan Complex Litigation Group, which billed 97.6 hours on this case, states that its work included "initial factual investigation and speaking with potential class members regarding their experiences after the breach, conducting legal research regarding potential claims; drafting initial pleadings and working on consolidated complaint; multiple client conferences for the purposes of, among other

things, review of relevant facts in the initial complaint and amended consolidated complaint, and status of matter and strategy; assisting Plaintiffs in gathering evidentiary materials; participating in the settlement mediation and working on settlement papers." (Marin Dec. ¶¶ 5, 7 (Docket # 198).)

- Sanford Heisler Sharp, LLP, which billed 122.95 hours on this case, states that its work included "investigating the facts of the case, conducting legal research regarding Plaintiffs' potential claims; drafting pleadings; multiple client conferences for the purposes of, among other things, review of relevant facts, status of matter and strategy, and review of the potential Settlement Agreement; corresponding with counsel for Defendants; assisting Plaintiffs in gathering evidentiary materials; attending the settlement mediation and working on settlement papers." (Sharp Dec. ¶¶ 4, 6 (Docket # 199).)

- The Sultzer Law Group, P.C., which billed 310.10 hours on this case, states that its work included "conducting legal research regarding Plaintiffs' potential claims; drafting pleadings; multiple client conferences for the purposes of, among other things, review of relevant facts, status of matter and strategy, and review of the potential Settlement Agreement; corresponding with counsel for Defendants; assisting Plaintiffs in gathering evidentiary materials; and attending the settlement mediation and working on settlement papers." (Sultzer Dec. ¶¶ 4, 6 (Docket # 200).)

- Wolf Haldenstein Adler Freeman & Herz LLP, which billed 147.25 hours on this case, states that its work included "initial factual investigation, conducting legal research regarding Plaintiffs' potential claims; drafting pleadings; multiple client conferences for the purposes of, among other things, review of relevant facts, status of matter and strategy, and review of the potential Settlement Agreement; corresponding with counsel for Defendants; assisting Plaintiffs in gathering evidentiary materials; attending the settlement mediation and working on settlement papers. Please note that most of this work was done by co-lead counsel Janine Pollack before she departed Wolf Haldenstein." (Malmstrom Dec. ¶¶ 4, 6 (Docket # 201).)

- Barnow and Associates, P.C., which billed 255.4 hours on this case, states that its work included "investigating the facts of the case, conducting legal research regarding Plaintiffs' potential claims; drafting pleadings; correspondence with Plaintiffs' counsel regarding strategy; corresponding with counsel for Defendants; and attending the settlement mediation and working on settlement papers." (Barnow Dec. ¶¶ 4, 6 (Docket # 202).)

- Stull, Stull & Brody, which billed 389.56 hours on this case, states that its work included "initial factual investigation and initial client contact, conducting legal research regarding Plaintiffs' potential claims; drafting pleadings; client conferences for the purposes of, among other things, review of relevant facts, status of matter and strategy, participation in

> and coordination of briefing and attendance at hearing of Multi-District Litigation Panel, researching laws of various states, performing initial draft of Amended Consolidated Complaint filed before this Court, and review of the potential Settlement Agreement; corresponding with counsel for Defendants; assisting Plaintiffs in gathering evidentiary materials; attending the settlement mediation and working on settlement papers."  (Brody Dec. ¶¶ 4, 6 (Docket # 203).)

The Court accepts the truth of these broad, non-specific descriptions of the attorneys' work and the number of attorney and professional hours expended on the case.  It concludes that the declarations reflect redundant and inefficient allocations of attorney resources. Seven of the law firms state that they were in attendance at the all-day, in-person mediation session of March 2020.  The attorney declarations repeatedly point to tasks like reviewing facts and filings and conferring on strategy.  There is an absence of concrete detail about the individual firms' contributions to the class and their work on the case.  In reviewing the work of counsel, a district court should exclude time that is excessive, redundant, or otherwise unnecessary.  Kirsch v. Fleet St. Ltd., 148 F.3d 149, 173 (2d Cir. 1998).  A court also acts within its discretion if it applies a percentage-based "reduction for vagueness, inconsistencies, and other deficiencies in the billing records."  Id.

The total number of 4,666.03 hours worked on behalf of the class is also high given the nature of this case and its procedural stage at the time the parties reached an agreement in principle.  This is not to suggest that plaintiffs' counsel did not provide valuable services to the class.  The Court is also mindful that this case began as three separate actions, each of which required the research and drafting of a separate complaint that were followed by motions to transfer.  In the Rudolph action, counsel from Faruqi and Faruqi also engaged in motion practice on defendants' motion to dismiss.  That motion required a close analysis of authority governing what constitutes an injury-in-fact when a consumer's information is accessed through a data

breach.  Rudolph partially prevailed on the motion, and the successful work of her attorneys informed the relief to the class.  (See 3/1/22 Tr. at 32-34.)  It is also to be expected that, following consolidation of the three actions, plaintiffs' counsel would continue to confer on aspects of the case, including analysis and consultation on litigation strategy, court filings and settlement.  It is to the parties' credit that this case was resolved at a relatively early stage of the case, prior to the taking of any deposition or other formal discovery, and before the parties undertook what would have been costly and labor-intensive motions for class certification or summary judgment.  At the same time, this case did not proceed past the motion-to-dismiss stage, and discovery was limited.  No depositions were taken and full document discovery did not commence.

Affording a generous view of the attorneys' submissions, it is not apparent why the efforts of counsel required 4,666.03 attorney and professional hours.  Faruqi and Faruqi alone billed 2,042.70 hours, including 987.3 hours of partner time.  (Peter Dec. ¶ 15.)  The joint declaration of Pollack and Peter and the firm-specific declaration of Timothy Peter do not explain why the work of Faruqi and Faruqi was so labor-intensive, nor is it apparent to the Court based on its own experience and familiarity with this case.  As mentioned, no firm has submitted its contemporaneous billing records or other detailed descriptions of the attorneys' work on behalf of the class.

To be clear, the time and labor expended by counsel has provided a valuable service to the class, but the attorney submissions made in support of the fees application suggest inefficiencies and redundancies, and the record submitted in support of the fees application is vague about the work of the plaintiffs' firms.  The Court will therefore weigh the redundant and inefficient allocation of attorney time and labor in determining a fees award.

2.  The Hourly Rates of Plaintiffs' Counsel Are on the High End of the <u>Reasonable Range.</u>

Senior partners at certain of plaintiffs' firms billed at hourly rates in the $900 to $1,000 range, while other partners billed at rates beginning at $600.  Associates generally billed in the range of $350 to $650, although a small number of senior associates billed at hourly rates of more than $700.  Paralegals billed time at hourly rates ranging from $150 to, in one instance, $400.

These rates are consistent with the higher end of the hourly rates that have been deemed reasonable in similar class action settlements over the past ten years, both in this district and others.  <u>See</u>, <u>e.g.</u>, Peter Dec. ¶ 20; King Dec. ¶ 8; Schaffer Dec. ¶¶ 24-25; <u>see also</u> <u>City of Westland Police & Fire Ret. Sys. v. MetLife, Inc.</u>, 2021 WL 2453972, at *2 (S.D.N.Y. June 15, 2021) (approving hourly rates that ranged from $170 to $1,058 in a securities fraud class action) (Kaplan, J.).  The hourly rates of counsel reflect some regional variances between the firms, such as the $600 hourly rate charged by a partner at Andersen Sleater Sianni LLC of Wilmington, Delaware and the hourly rates of $725 and $650 charged by the partners at Goldenberg Schneider, LPA in Cincinnati, Ohio.  The hourly rates also account for the fact that the plaintiffs' firms are all experienced in class-action litigations.

The Court therefore concludes that the hourly rates of the attorneys and legal support staff are reasonable.

E.  <u>The Magnitude and Complexity of the Case.</u>

As discussed, this case involved the breached data of approximately 3 million payment cards.  The magnitude and complexity of this case are reflected in the volume of affected payment cards and the technical details of how malware breached the retailers point-of-payment system and payment-card data made its way to the so-called "dark web."  If this case

had not settled, it is likely that discovery, motion practice and trial would have prolonged the action by several years and significantly increased the attorneys' fees.  It is also likely that issues of damages and causation would have been heavily informed by expert testimony.  In the event that either party moved for summary judgment or this case proceeded to trial, plaintiffs would have had the task of demonstrating liability not only on their common law claims but under consumer-protection and data-privacy laws of Arizona, California, Connecticut, Florida, Illinois, New Jersey, New York, Texas, Nevada and Georgia.

This is a case of moderate magnitude and complexity.  This factor weighs in favor of an award of attorneys' fees.

F.   The Risks of Litigation.

Plaintiffs would have faced a series of risks in pursuing this case through a jury verdict and judgment.  A motion for class certification would likely have been contested, with defendants urging that individual issues of damages predominated over issues that are common to the class.  Plaintiffs' submissions suggest that proving damages would have been a complicated task that turned on the testimony of competing experts.  Plaintiffs also would have been required to demonstrate negligence on the part of defendants, which would have required them to prove that defendants breached a duty of care.  This would also likely have required expert testimony on matters of data security, as well as detailed evidence about the nature of the breach and defendants' knowledge about the potential for such a breach.

Plaintiffs' counsel also took this case on a contingency basis, and risked non-payment in pursuing this case on behalf of the class.  (Pollack and Peter Dec. ¶ 23.)

The risks of litigation weigh in favor of an award of an attorneys' fees award.

G.  The Quality of Representation.

Goldberger states that quality of representation is best assessed by comparing the results of the settlement against plaintiffs' maximum possible recovery.  209 F.3d at 55.  As the Court discussed in connection with its review of the Settlement Agreement, plaintiffs have candidly acknowledged the difficulties of estimating a maximum range of likely recovery in a data breach case, given that no such claims have proceeded to jury verdict.  The recovery afforded to individual class members – $30 for a Tier 1 claimant, and reimbursement for out-of-pocket expenses up to $5,000 for a Tier 2 claimant – is consistent with similar data-breach class action settlements that have been brought throughout the country.  As discussed, this recovery is fair, reasonable and adequate from the standpoint of the individual class members.

The quality of representation was also demonstrated in the partially successful opposition to defendants' motion to dismiss the claims in the Rudolph action.  Plaintiffs' counsel at Faruqi and Faruqi ably advanced the interests of Rudolph – and, by extension, the class – in bringing claims that partially survived the standing threshold and defendants' motion to dismiss under Rule 12(b)(6).

The experience of counsel is also relevant.  The fourteen plaintiffs' firms have annexed firm resumes to their attorney affidavits.  The plaintiffs' firms are experienced class-action law firms with a history of representing plaintiffs in complex cases, including data-breach actions.  Defendants are represented by Morgan, Lewis & Bockius LLP, which is an experienced and well-resourced firm.

The Court concludes that the quality of representation weighs in favor of an award of attorneys' fees.

H.  The Requested Fee in Relation to the Settlement.

The Court has discussed in detail the structure of this settlement.  The payment to the class will total $278,483.81.  In addition, the Settlement Agreement provides that defendants will pay $250,000 of the expenses borne by the claims administrator.  (Settlement Agrm't ¶¶ 2.4, 10.2.)  Though not a direct payment to class members, the costs of claims administration would typically be drawn from a common fund, and reflects a benefit to the class that was based on the efforts of plaintiffs' counsel.  See generally Masters, 473 F.3d at 438 ("Arguably, the entire Settlement Fund is a 'benefit achieved for class members.'").

As noted, the Settlement Agreement also provides for prospective structural relief directed to defendants' data security measures.  (Settlement Agrm't ¶¶ 2.5.)  In a letter dated May 13, 2021, defense counsel stated to plaintiffs' counsel that "[t]he full value of this [structural] relief for the three-year period is in excess of $20 million," based on what defendants expect to spend in order to meet these requirements.  (Pollack & Peter Dec. Ex. A.)  There is no documentation that explains the $20 million calculation.  Of course, it is in defendants' own economic self-interest to secure their payment systems following a significant breach, regardless of plaintiffs' claims in this case.  Nevertheless, the structural relief does provide some prospective benefit to class members, all of whom have previously shopped in person at the defendant retailers, and reflects positively on the settlement.

Plaintiffs' fee application of $1,346,799.40 seeks a significant percentage of the settlement.  It is approximately 2-1/2 times greater than the combined value of the payment to the class and the expenses of the settlement administration.  Counsel's combined fees and expenses of $1.4 million would total 72% of defendants' total payment to resolve this case.  The requested fee's relation to the settlement weighs against the size of the fees request.

I.   Public Policy Considerations.

Public policy favors a fees award.  The public benefits when attorneys undertake a complex commercial case that implicates consumer protections and data privacy.  Cf. Wal-Mart Stores, 396 F.3d at 122 (discussing importance of private litigation in enforcing the antitrust laws).  In addition to providing compensation to injured class members, the litigation and settlement of plaintiffs' claims incentivizes retailers to take stronger data-protection measures.  Plaintiffs' counsel also undertook this case on a contingency basis with no guarantee that its time and expenses would be recovered.

Public policy weighs in favor of an attorneys' fees award.

J.   Reaction of the Class.

There have been no objections to the settlement and no requests to opt out of the class.  This factor weighs in favor of the fees application.

At the same time, the Court notes that the class consists of consumers, nearly all of whom will recover a set sum of $30.  In the related class action, Arkansas Federal Credit Union v. Hudson's Bay Company, 19 Civ. 4492 (PKC), the Court afforded significant weight to the fact that no class members objected to a settlement agreement and fees application that was similar to those brought here because the class consisted of financial institutions, which have the resources and expertise to evaluate in detail the terms of settlement.  (12/7/21 Tr. at 14, 18 ("The class of financial institution[s] is a sophisticated and well-resourced class capable of understanding and scrutinizing the settlement, but none have objected . . . .  The reaction of the class is an important factor here because we have sophisticated financial institutions in the class.") (19 Civ. 4492, Docket # 110).)  Here, a consumer in the class is less likely to scrutinize

the particulars of the settlement and the relationship between the payment to the class and the award of attorneys' fees.

Accordingly, the Court affords some weight to the reaction of the class, which supports an attorneys' fees award.

K.   Plaintiffs Will Be Awarded $897,866.26 in Attorneys' Fees.

Having reviewed the Goldberger factors and considered the structure of the parties' settlement, the Court will apply a one-third reduction to the plaintiffs' requested fees award of $1,346,799.40, and award fees in the total amount of $897,866.26.

In applying this across-the-board reduction, the Court affords weight to the settlement's value to the class.  For the reasons discussed, the settlement here cannot be analogized to a traditional common fund, which would be used to pay claimants, award attorneys' fees and cover the costs of claims administration.  In this case, the benefit of the settlement to the class includes the $278,483.81 to be paid directly to claimants, the $250,000 earmarked for claims administration, and the structural relief agreed upon by the parties.  The Court is unable to determine an approximate value that the structural relief provides to the class, but concludes that a class consisting of retail customers will benefit from prospective structural relief that is intended to better safeguard their payment information, and that the structural relief should weigh in favor of counsel's fees application.[3]

The benefit of the settlement to the class also includes any fees and expenses ultimately awarded to counsel.  See Masters, 473 F.3d at 437 ("The entire Fund, and not some portion thereof, is created through the efforts of counsel at the instigation of the entire class."); Torres v. Toback, Bernstein & Reiss LLP, 2017 WL 281878, at *2 (E.D.N.Y. Jan. 23, 2017)

---

[3] Lord & Taylor no longer operates brick-and-mortar stores, as it did at the time of the data breach.

("the attorneys' fees are part of the recovery in a typical common fund case and are therefore part of the denominator in the calculation of the percentage.").  The payment of reasonable attorneys' fees and expenses benefits the class by compensating counsel for their efforts on behalf of the class.  As will be discussed, the Court concludes that the $53,200.60 in expenses sought by counsel is a relatively modest sum and that the application for reimbursement of expenses will be granted.

Accordingly, the benefit of the class totals $581,684.41, plus any award of attorneys' fees.  This settlement reflects a positive result for the class but is also an amount well below the $2 million "Aggregate Cap" that plaintiffs have analogized to a common fund.  An attorneys' fees award of $897,866.26 increases the total value of the settlement to $1,479,550.67.  The attorneys' fees award totals approximately 60.68% of the value of the settlement – a significant percentage that is far higher than the 36.7% sought in plaintiffs' application, even if the total amount the fees is lower than plaintiffs have requested.

In addition to considering the benefits to the class, a one-third reduction in the fees request by plaintiffs' counsel is also appropriate based on the redundancies and inefficiencies reflected in their application, as well as the submissions' lack of supporting detail.  To use the most obvious example, seven plaintiffs' firms have indicated their attendance at the in-person mediation session of March 2020.  Even viewing the application generously, plaintiffs have not demonstrated why 4,666.03 attorney and professional hours were required for the prosecution of this case.  See City of Westland, 2021 WL 2453972, at *4 (applying a "a 10 percent across the board reduction of counsel's lodestar" because vague descriptions of attorney "litigation strategy and analysis" did not support the reasonableness of the 2,298.3 hours recorded in that category).

An award of $897,866.26 is a negative lodestar multiplier of 28.4% against the lodestar of $3,161,778.36.  No class members have objected to the proposed fees award and public policy should incentivize plaintiffs' attorneys to bring claims that encourage better data-protection practices.  The Court also balances the prospect of an attorney windfall against the risk of disincentivizing counsel from bringing meritorious claims in the future.  Babcock v. C. Tech Collections, Inc., 2017 WL 1155767, at *10 (E.D.N.Y. Mar. 27, 2017) ("higher percentages are generally allowed for relatively small total settlements.").

Accordingly, plaintiffs' application for attorneys' fees will be granted, but the fees award will be modified to the amount of $897,866.26.

THE APPLICATION FOR REIMBURSEMENT OF EXPENSES WILL BE GRANTED.

Plaintiffs' counsel seeks the reimbursement of $53,200.60 in out-of-pocket expenses.  These expenses are summarized in the attorney affidavits submitted by the fourteen plaintiff firms.  They include routine expenses such as the mediator fee, expert fees, travel, meals, filing fees, legal research, photocopying and service of process expenses.  The expenses are reasonable and the application for their reimbursement will be granted.

PLAINTIFFS' APPLICATION FOR SERVICE AWARDS WILL BE DENIED.

Plaintiffs seek a service award of $1,000 to each of the fifteen individual plaintiffs.  Each plaintiff has submitted a declaration that describes his or her participation in the litigation, as well as time spent personally responding to the data breach.  (Docket # 204 to 218.)

Class members' confidence in their representation "derives in large measure from knowing that the class representative stands in the same shoes as all other members of the class. If the class does well, the class representative will do well in the same proportion to others." Silberblatt v. Morgan Stanley, 524 F. Supp. 2d 425, 435 (S.D.N.Y. 2007).  "Service awards to

class representatives while not foreclosed, should be closely scrutinized." Hirsch v. Citibank, N.A., 2018 WL 1779376, at *6 (S.D.N.Y. Mar. 26, 2018) (Batts, J.) (quotation marks omitted). A service award may be warranted by "special circumstances," including a plaintiff's personal risk in becoming a litigant, the time and effort expended on behalf of the class, and other burdens sustained by the plaintiff. Id. For instance, in an employment case, a plaintiff may be a current or former employee whose work on behalf of the class risks adverse actions by the employer or co-workers. Tiro v. Pub. House Invs., LLC, 2013 WL 4830949, at *11 (S.D.N.Y. Sept. 10, 2013) (McMahon, J.). "[W]here a named plaintiff is acting as representative, an improvident award can suggest or give rise to the concern that the named plaintiff is benefitting at the expense of the persons for whom he or she acts as fiduciary either directly, through a payment from a common fund otherwise available to [class members], or indirectly, by compromising the claims of the absent [class members] in exchange for payment in the form of a service fee." Allred on behalf of Aclaris Therapeutics, Inc. v. Walker, 2021 WL 5847405, at *6 (S.D.N.Y. Dec. 9, 2021) (Liman, J.).

Plaintiffs do not identify any special risks or burdens that warrant a service award. Many of the plaintiffs have described time spent monitoring their accounts and attempting to address fraudulent expenditures and withdrawals made on compromised payment cards. Compensation for these activities, as well as for out-of-pocket expenses attributable to the data breach, should be subject to the claims-administration process and conform to relief afforded to the class as a whole. An extra service award to plaintiffs based on injuries attributable to the breach would place them in a position that advantages them over members of the class, and could call into question the adequacy of their representation under Rule 23. Therefore, to the extent that the plaintiffs' declarations seek a service award for time spent monitoring their

accounts, resolving fraudulent withdrawals and charges, or any out-of-pocket expenses connected to the breach, their application is denied.

Each plaintiff also describes, with varying levels of detail, some time spent on the case that inured to the benefit of the class, including time spent reviewing pleadings, settlement documents and conferring with class counsel.  These are not special circumstances that warrant a service award.  Some of the fifteen plaintiffs have provided more detailed accounts of time spent both responding to the breach and participating in this litigation, with the number of hours dedicated specifically to the litigation varying from approximately five hours to eighteen-and-a-half hours.  Most plaintiffs report spending between six and eight hours on tasks specific to the case.  Plaintiffs have not identified risks associated with their roles as plaintiffs in this case, or, for example, travel expenses, lost wages, lost opportunities or lost vacation time that they incurred as a result of their work on behalf of the class.[4]

Plaintiffs have not demonstrated that a service award is warranted, and their application for a service award will be denied.

CONCLUSION.

For the reasons explained, plaintiffs' motion for final approval of the class action settlement will be GRANTED.  Plaintiffs' motion for an award of attorneys' fees will be GRANTED in the amount of $897,866.26, as will the application for the reimbursement of

---

[4] Two of the plaintiff affidavits reference travel expenses and lost wages, but they do not expressly identify them in relation to work on behalf of the class. Plaintiff Mark Wade has stated that he spent 661 hours responding to the breach, including a 42-hour drive from Las Vegas to Jacksonville and back in order to speak to a TD Bank representative, but his time and expenses related to fraudulent withdrawals and charges made to his own payment card, and not work on behalf of the class.  (Docket # 213.)  Plaintiff Alexandra Rudolph has stated that she "had to take time off [her] job" to look for documents requested by defendants, review financial records and prevent or identify identity theft and fraud.  (Docket # 204 ¶ 10.)  She does not distinguish time spent on behalf of the class from the time spent securing her own information, and has not identified an added expense or risk that warrants a service award.

reasonable expenses in the amount of $53,200.60.  Plaintiffs' application for service awards will be DENIED.

Plaintiffs are directed to file within five business days a revised Proposed Final Approval Order and Judgment that conforms to this Opinion.

The Clerk is respectfully directed to terminate motions 183 and 185.

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated:  New York, New York
        June 8, 2022